**CAMEL HAIR AND CASHMERE INSTITUTE OF AMERICA, INC.**
Plaintiff, Appellant,

v.

**ASSOCIATED DRY GOODS CORPORATION, d/b/a Lord & Taylor, et al.,**
Defendants, Appellees.

No. 86–1054.

United States Court of Appeals,
First Circuit.

Sept. 2, 1986.

you had brought it to my attention ahead of time so I could have instructed it."

Robert J. Kaler with whom Gadsby & Hannah was on brief for plaintiff, appellant.

Stephen M. Sheehy with whom Kaye, Fialkow, Richmond & Rothstein was on brief for defendants, appellees Associated Dry Goods Corp. d/b/a Lord & Taylor; Lord & Taylor, Inc.; Mr. Coats, Inc. and Mr. Coats for Her, Inc.

Andrew J. McElaney, Jr. with whom Lauren G. Gross and Nutter, McClennen & Fish were on brief for appellee Federated Dept. Stores, Inc. d/b/a William Filene's Sons Co.

Before CAMPBELL, Chief Judge, and BOWNES and TORRUELLA, Circuit Judges.

BOWNES, Circuit Judge.

Plaintiff, Camel Hair and Cashmere Institute of America, Inc., appeals from the denial of its motion for preliminary injunctive relief seeking to enjoin the defendants, Associated Dry Goods Corporation d/b/a Lord & Taylor (Associated), Lord & Taylor, Inc., Federated Department Stores, Inc. d/b/a Filenes (Federated), Mr. Coats, Inc., and Mr. Coats For Her, Inc., from selling or offering for sale a line of Mr. Coats For Her cashmere blend coats labelled 50 percent cashmere. The underlying action alleges trafficking in falsely described goods in violation of section 43(a) of the Lanham Trademark Act, 15 U.S.C. § 1125(a) (1982), common law unfair competition and violations of the Massachusetts Unfair and Deceptive Trade Practices Act, Mass.Gen. Laws Ann. ch. 93A (1983). Plaintiff's complaint seeks compensatory and punitive damages and permanent injunctive relief. Two main issues arise on appeal: (1) plaintiff's standing to litigate this suit, and (2) the showing of injury required to establish a right to preliminary injunctive relief under the Lanham Act.

*Background*

Plaintiff is a nonprofit corporation. It was organized in March 1984 at a time when the camel hair and cashmere trade was in ferment because of the proliferation of mislabelled counterfeit luxury fibres. The corporation's aim was to promote the use of camel hair and cashmere fibres and to safeguard the interests of the cashmere and camel hair industry by educating the public, retail dealers and garment makers about what was or was not a legitimate cashmere or camel hair product. Plaintiff has no employees of its own. It is headed by Karl Spilhaus, an attorney employed as president of the Northern Textile Association, who serves as plaintiff's executive director. Plaintiff has five full members: Forte Cashmere Corporation (Forte); Amicale Industries, Inc. (Amicale); Jacques deLoux (deLoux); Warren Corporation (Warren); Joseph Dawson Limited (Dawson), and one associate member, Merin Brothers Coat Company (Merin). Members' annual dues range from $5,000 to $15,000, associate member dues are $1,000 per annum. All the plaintiff's members either manufacture or market camel hair and cashmere, or garments containing those fibres. Amicale derives approximately 10 percent of its business, and Warren approximately 5 percent, from manufacturing cashmere blend outerwear fabric, the fabric from which cashmere blend coats are made. Dawson and deLoux manufacture cashmere sweaters, Dawson being one of the largest users of cashmere in the world. Forte is a spinner and dehairer of luxury fibres, including camel hair and cashmere, and Merin manufactures coats of 100 percent cashmere.

On November 16, 1984, the plaintiff bought a Mr. Coats For Her coat labelled

70 percent cashmere from a Filenes retail store and sent it to a research laboratory, Albany International Research Company (Albany), for chemical and microscopic analysis of its fibre content. The analysis indicated that the coat had less than a 10 percent cashmere content. On January 16, 1985, plaintiff bought a second Mr. Coats For Her cashmere blend coat, at a Lord & Taylor store. Though the coat was labelled 50 percent cashmere, it was found at Albany to contain only 12.4 percent cashmere. Plaintiff promptly notified the presidents of both Filenes and Lord & Taylor of the apparent mislabelling in Mr. Coats For Her cashmere blend coats and advised them that it would pursue legal remedies if the coats were not withdrawn from sale until properly labelled. Filenes referred the matter to Mr. Coats For Her in accordance with its usual practice of referring complaints of noncompliance with labelling laws to the vendor involved. Lord & Taylor also appear to have referred the matter to Mr. Coats For Her because the plaintiff did not receive a response from Lord & Taylor directly, but rather received a letter from Mr. Coats For Her's attorney on Lord & Taylor's behalf. The letter stated that Mr. Coats For Her were standing by their labels because tests it had requested on the coats from the University of Lowell Research Foundation (Lowell) indicated that the labels were substantially accurate.

Faced with this discrepancy between the Albany and Lowell test results, plaintiff convened a meeting between the experts from both institutions on February 27, 1985. According to the affidavit of Karl Spilhaus, Lowell's expert agreed at that meeting with the critique presented by Albany's expert of Lowell's test methods and results. Both experts examined together a sample of the fabric used in the coat plaintiff purchased in Filenes and, according to Spilhaus, Lowell's expert agreed to amend his report to reflect the fact that the sample was predominantly wool and not cashmere. Lowell, however, refused to acknowledge its expert's admissions and continued to stand by its original analytical methods and results.

The marketing of the Mr. Coats For Her cashmere blend coats continued. In the eight months following the meeting between the two experts plaintiff bought seven more Mr. Coats For Her cashmere blend coats from one or other of the defendants' stores and had each one tested at Albany. All the coats proved to have substantially less cashmere than was represented on their labels; one coat, bought from a Filenes store, marked 60 percent cashmere tested out as having only 33.5 percent cashmere, and the other six, all labelled 50 percent cashmere, tested out as having between 5 and 14 percent cashmere. On October 29, 1985, the plaintiff filed suit and an accompanying motion for a preliminary injunction. The court ordered the parties to file affidavits representing direct testimony and began hearings on the motion on November 22, 1985.

*Proceedings Below*

Up to the date the hearings commenced the defendants maintained that the 50 percent cashmere labels were accurate, relying on the Lowell reports. At the beginning of the hearings, however, plaintiff's counsel pointed out that a new affidavit had been submitted by defendants from Ray Robinson, a fibre analyst employed by the United States Testing Company, Textile Service Division, and that Robinson's affidavit stated that he had tested three sample coats and found them to contain 28, 28.5 and 29 percent cashmere respectively. Defendants then offered to stipulate that all coats then in the possession of Mr. Coats For Her, Inc., labelled Mr. Coats For Her and 50 percent cashmere, would not be sold until they had been relabelled to state a 25 percent cashmere content. With respect to the coats of this description in the possession of the other defendants, it was to be stipulated that they would be relabelled as quickly as possible to reflect a 25 percent cashmere content and that in no event would any such coats be available for sale in any of defendants' stores after Monday noon, November 25. Defendants' stated purpose in entering this stipulation was to avoid the adverse publicity that would fol-

low if an injunction was issued against them. Plaintiff objected to the stipulation on the grounds that the coats had less than a 25 percent cashmere content. Plaintiff also argued that any stipulation should include an agreement not to sell any more of the coats while they were marked 50 percent cashmere, and that the defendants' decision to wait until after the weekend to remove the coats from sale for relabelling was evidence of bad faith. In light of plaintiff's opposition to the stipulation, the court determined to continue with the hearing. It was agreed, however, that the defendants would execute the stipulation even though it would not operate as a substitute for further proceedings.

After four days of hearings, the court concluded that the plaintiff's expert evidence was more credible than that of the defendants. It held that the plaintiff had shown a likelihood of success on the merits of its claim that the coats would be mislabelled even if relabelled as 25 percent cashmere. The court then instructed the parties to submit whatever evidence they had on the other prerequisites for preliminary injunctive relief.

On the fifth and final day of hearings counsel for Federated, who had taken over the representation of Federated from Mr. Coats For Her's counsel, informed the court that Filenes and Filenes Basement (a separate division of Federated) had ceased offering the coats at issue for sale, and that all their Mr. Coats For Her cashmere blend coats had been returned to the vendor. Federated submitted two affidavits from Filenes' Divisional Merchandise Manager, Barry Gilbert, confirming that the coats had been removed from the floor of Filenes on Monday, November 22, and from the floor of Filenes Basement on Tuesday, November 26. Irving Baker, president of Mr. Coats For Her, also testified that Filenes and Filenes Basement had returned the coats and had been reimbursed by Mr. Coats For Her for them. The court then asked the plaintiff to define its theory of injunctive relief against Federated, stating that it saw no justification for imposing the potential harm of an injunction on Federated if Federated had been marketing the coats in good faith. Plaintiff cited Federated's delay in removing the coats from sale until after the weekend as evidence of Federated's bad faith. Plaintiff also claimed that Federated should have asked Mr. Coats For Her to carry out specific tests on specific garments once it learned of plaintiff's allegations that the coats were mislabelled. The court held this insufficient to establish that Federated had wilfully and knowingly marketed mislabelled coats. It then dismissed Federated from further proceedings on plaintiff's motion for a preliminary injunction.

As to the other defendants, the court found that there was a probability that further marketing of mislabelled coats would occur if an injunction was not issued, and that the public interest would be served by an injunction. The focus of the hearing then switched to the issue of irreparable harm. The court indicated that there were two problems with plaintiff's showing of irreparable harm: (a) that the allegation of harm rested on the attenuated inference that the sale of mislabelled cashmere blend coats would cause loss of sales of cashmere products generally, and (b) that such injury, if shown, would be caused to plaintiff's members, none of whom had been joined in the suit, rather than to the plaintiff itself. The court held that the plaintiff had failed to show a probability of harm to itself. It rejected the plaintiff's claim that its members were likely to be both unable and unwilling to pay their dues to the plaintiff if the injunction was denied.

The critical issue then became whether the plaintiff had standing to sue on behalf of its members. After receiving additional briefs from the parties on this issue, the court concluded that the plaintiff did not have such standing. It held that adjudication of the members' claims would require member-by-member determinations and that such individualized proof of the members' claims would be inconsistent with associational standing. Further, it held that the inference of injury to plaintiff's members was too attenuated to make out a

claim under the Lanham Act, even if plaintiff could assert associational standing.

## I. PLAINTIFF'S SHOWING OF INJURY TO ITSELF

 The wording of section 43(a) of the Lanham Act, "[a]ny person who shall affix, apply, or annex or use in connection with any goods or services ... any false description or representation ... shall be liable to a civil action by ... any person who believes that he is or is likely to be damaged by the use of such false description or representation," clearly indicates that a showing of actual or likely injury is necessary to make out a claim for relief. Plaintiff claims that the defendants' sale of the mislabelled coats was causing, or likely to cause it injury in two ways: by damaging its reputation and credibility as a public interest organization; and by causing such severe harm to its members as to impair the members' ability to pay their dues to the plaintiff.

We agree with the district court that the plaintiff's allegations of injury to itself fall short of a showing warranting preliminary injunctive relief under the Act. There is nothing in the record to show that plaintiff's reputation (as distinct from the reputation of cashmere fabric) will be harmed if an injunction does not issue. Indeed, plaintiff has adduced no evidence to show what kind of reputation it has that is in danger of being harmed. It does not promote cashmere by advertising in the mass media and the record shows that the bulk of its promotional activities have consisted of the kind of policing functions that led to the instigation of this suit. Thus, there is no indication that the general public even knows of plaintiff's existence. Further, given the tenacity with which the plaintiff appears to have pursued its policing functions, we see no reason to assume that its reputation will be diminished in the eyes of its members solely because it fails to obtain preliminary injunctive relief in this case.

We are likewise unpersuaded that its members will be unable to pay their dues if preliminary injunctive relief is not granted.

The amount of dues payable ($5—$15,000) does not appear onerous and it stretches things to assume that the members might be reduced to that level of impecunity by the defendants' activities.

## II. PLAINTIFF'S STANDING TO SUE ON BEHALF OF ITS MEMBERS

In *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975), the Supreme Court held that an association may have standing solely as the representative of its members even in the absence of injury to itself, in certain circumstances. The kind of circumstances in which such standing will be recognized were subsequently defined by the Supreme Court in *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977).

In that case the plaintiff Commission, a statutory agency for the promotion and protection of the Washington apple industry, filed suit challenging the constitutionality of a North Carolina statute which prohibited the use of all grades other than the applicable United States grade on closed containers of apples shipped into the state for sale. The Commission's complaint sought a declaration that the statute violated the Commerce Clause insofar as it prohibited the display of Washington state grades, and contained a request for a permanent injunction against its enforcement. A three-judge district court granted the requested relief and North Carolina appealed to the Supreme Court. The Court upheld the lower court's ruling and rejected North Carolina's argument that the Commission did not have standing to maintain the action. Relying on its earlier decision in *Warth,* the Court held that an association has standing to sue on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purposes; and (3) neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. 432 U.S. at 343, 97 S.Ct. at 2441.

The Supreme Court reaffirmed this doctrine of associational standing in *Automobile Workers Union v. Brock,* —— U.S. ——, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986). The Secretary of Labor there argued that, absent a showing of particularized need, members of an association wishing to litigate a common question of law or fact against the same defendant should be permitted to proceed only pursuant to the provisions contained in the Federal Rules of Civil Procedure for class actions. The Court rejected the Secretary's argument. It held that it failed to take account of the special features distinguishing suits by associations on behalf of their members from class actions, and that suits by associations operate to the benefit of the individuals represented and the judicial system as a whole. —— U.S. at ——, 106 S.Ct. at 2533. Specifically, the Court noted the advantage of having an association, able to draw upon a preexisting reservoir of expertise and capital, represent its members, over an *ad hoc* union of plaintiffs in a class action, linked only by their common claims and lacking such expertise and resources. *Id.* It also pointed out that one of the primary reasons people join an organization is to create an effective vehicle for vindicating interests that they share with others and that the doctrine of associational standing recognizes this fact. *Id.* The Court concluded that the only practical judicial policy when people pool their interests, activities and capital under a name and form that will identify collective interests is to permit the association to vindicate the interests of all in a single case, quoting *Joint Anti-Fascist Refugee Committee v. McGrath,* 341 U.S. 123, 187, 71 S.Ct. 624, 656, 95 L.Ed. 817 (1951). It further observed that the very forces causing individuals to band together in an association provide some guarantee that the association will work to promote the members' interests. *Id.* The Court did acknowledge, however, the validity of the Secretary's concern that associations allowed to proceed under *Hunt* might not always adequately represent the interests of all their members, and that a judgment won against an association in this

regard might offend due process principles if it resulted in precluding subsequent claims by the association's members. *Id.* —— U.S. at ——, 106 S.Ct. at 2533. It stated that ways of alleviating such a problem would have to be considered if any evidence of an association's inability to proceed on behalf of its members were presented, but noted that the Secretary had not adduced any reason to question the ability of the U.A.W. to proceed on behalf of its members. *Id.*

Given this strong endorsement of the associational standing doctrine, we turn now to consider the plaintiff's showing of such standing under the three *Hunt* criteria. As harm to the reputation of cashmere is precisely the kind of harm the plaintiff corporation was designed to prevent, the requirement that the suit be germane to the association's purposes is clearly met here. We confine our discussion, therefore, to the other two requirements.

A. *The Standing of Plaintiff's Members to Sue in Their Own Right*

In *Quabaug Rubber Co. v. Fabiano Shoe Co., Inc.,* 567 F.2d 154, 160 (1st Cir. 1977), we held that the dispositive question in determining whether a plaintiff is a proper person to bring a claim under the Lanham Act, is whether the plaintiff has a reasonable interest in being protected against false advertising. 567 F.2d at 160. Other circuits have also adopted this approach and there appears to be a general consensus that the plaintiff does not have to be a competitor in order to have standing to sue. *See Colligan v. Activities Club of New York, Ltd.,* 442 F.2d 686, 692 (2d Cir.), *cert. denied,* 404 U.S. 1004, 92 S.Ct. 559, 30 L.Ed.2d 557 (1971); *Smith v. Montoro,* 648 F.2d 602, 607 (9th Cir.1981); *Thorn v. Reliance Van Co., Inc.,* 736 F.2d 929, 933 (3rd Cir.1984). The requirement that the plaintiff have a reasonable interest in being protected, however, does not mean that it is sufficient for the plaintiff merely to establish a falsehood in the defendant's advertising or marketing; the plaintiff must also show a link or "nexus" between

itself and the alleged falsehood. *Quabaug Rubber*, 567 F.2d at 160.

We find that the plaintiff's members do have a sufficient nexus to the alleged wrong here to sue in their own right. We recognize that none of the five full members compete with the defendant in the sense of selling coats, and that Merin, the associate member, sells only 100 percent cashmere coats and is to that extent selling to a different market. Nonetheless, their position as manufacturers and vendors of fabric and clothing containing cashmere gives them a strong interest in preserving cashmere's reputation as a high quality fibre.

### B. *The Need for the Participation of Plaintiff's Individual Members*

Actions for declaratory, injunctive and other forms of prospective relief have generally been held particularly suited to group representation. *See Warth v. Seldin*, 422 U.S. at 515, 95 S.Ct. at 2213; *Olagues v. Russoniello*, 770 F.2d 791, 799 (9th Cir.1985); *Chicago-Midwest Meat Ass'n v. City of Evanston*, 589 F.2d 278, 281 (7th Cir.), *cert. denied*, 442 U.S. 946, 99 S.Ct. 2895, 61 L.Ed.2d 318 (1978). Whether the present action is so suited depends on the kind of showing required to warrant granting injunctive relief under the Lanham Act.

The cases under the Act have drawn a clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages. In *Quabaug Rubber Co. v. Fabiano Shoe Co.*, 567 F.2d at 160–61, this court held that a showing that the defendant's activities are likely to cause confusion or to deceive customers suffices to warrant injunctive relief, but that a plaintiff must show actual harm to its business, a diversion of sales, for example, in order to recover damages. This rule has been followed by several other circuits. *See Coca-Cola Co. v. Tropicana Products, Inc.*, 690 F.2d 312, 316–17 (2d Cir.1982); *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746, 753 (8th Cir.1980); *Hesmer Foods, Inc. v. Campbell Soup Co.*, 346 F.2d 356, 359 (7th Cir.1965).

As we are concerned only with the question of preliminary injunctive relief, the participation of plaintiff's individual members is not necessary to litigate this action. The nub of the plaintiff's claim, that the coats were mislabelled, depends on the plaintiff's expert evidence, not on evidence that differs from member to member. In addition, the relief sought, that the sale of the mislabelled coats be enjoined, will affect all the members in the same way. There is no conflict here between the needs and interests of the members. Moreover, *Automobile Workers Union v. Brock*, establishes that a plaintiff should not be prevented from litigating a claim for injunctive relief merely because its members' claims will have to be considered individually to determine their right to monetary relief. And defendants have adduced no reason to suggest that the plaintiff cannot adequately represent its members' interests. Accordingly, we hold that plaintiff does have standing to represent its members in this suit.

### III. THE PROPRIETY OF PRELIMINARY INJUNCTIVE RELIEF

In the First Circuit a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction. *See Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981). In *Planned Parenthood League of Massachusetts*, this court defined the standard of review applicable to an appeal from the denial of a preliminary injunction as follows:

The decision to grant or deny a preliminary injunction is a matter for the discre-

tion of the district court and is reversible, of course, only for an abuse of discretion. It is also well-settled, however, that the application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion. Similarly, misapplication of the law to particular facts is an abuse of discretion. In either of these circumstances, the denial of the preliminary injunction should be reversed and the injunction entered if necessary to protect the rights of the parties.

641 F.2d at 1009 (quoting *Charles v. Carey,* 627 F.2d 772, 776 (7th Cir.1980)). With these principles in mind, we turn to the merits of the claim for preliminary injunctive relief before us.

A. *The Denial of a Preliminary Injunction Against Federated*

■ The district court denied injunctive relief against Federated on the ground that the plaintiff had failed to show that Federated had knowingly and wilfully marketed mislabelled coats. Although a showing of intent or lack of good faith on the part of the defendant is not necessary to make out a claim under the Lanham Act, *Purolator, Inc. v. EFRA Distributors, Inc.,* 687 F.2d 554, 561 (1st Cir.1982), we agree with the district court that Federated's good faith is relevant to the question of whether a preliminary injunction should issue. It is a significant factor to take into account in determining the likelihood that Federated will cause injury to the plaintiff's members in the future. Federated's action in removing the coats from sale and returning them to the vendor, meant there was no likelihood of its causing any injury to the members at the time the request for an injunction was being considered. Moreover, the promptness of its action in taking the coats off its sales floors as soon as it learned that the vendor could not stand by the labels on the coats indicates that it is most unlikely to sell the coats in the future. Plaintiff argues that this inference cannot be drawn in Federated's favor. It points to Federated's earlier refusal to take all the coats off the floor until they had been relabelled to reflect a 25 percent cashmere content, as evidence of Federated's bad faith, and of the need for a preliminary injunction to ensure Federated does not start selling the mislabelled coats in the future. Plaintiff's argument is not persuasive. At the time plaintiff called for immediate relabelling of the coats, Federated was relying on the representations of Mr. Coats For Her, that its expert had verified the 50 percent cashmere label. There is no hint of any proclivity or interest on the part of Federated to sell those coats after that assurance had been vitiated by the affidavit of the new expert. Further, the testimony of Filenes' Divisional Sales Manager, Barry Gilbert, that there were no plans to reorder the coats, shows that Federated does not intend to sell these coats in the future. Nothing in the record impugns the credibility of that testimony. We, therefore, hold that the court did not abuse its discretion in denying preliminary injunctive relief against Federated.

B. *The Denial of Preliminary Injunctive Relief Against the Other Defendants*

■ The district court denied injunctive relief against the other defendants on the ground that the inference of injury to them was too attenuated. The court interpreted the Lanham Act's likelihood of damage requirement as requiring a showing that the plaintiff was likely to lose sales. It viewed as "commonsense" the inference that the sale of cashmere blend coats which overstated their cashmere content could cause a loss of sales of cashmere blend coats which correctly stated their cashmere content. It rejected, however, plaintiff's contention that the sale of cashmere blend coats represented to contain more cashmere than they actually did would cause a loss of sales of cashmere products generally. Since none of the plaintiff's members actually sold coats, the court held there was no risk of irreparable injury to them. As for Merin, the plaintiff's associate member who does sell coats, the court held there was no likelihood of irreparable injury to it be-

cause the coats it sold were 100 percent cashmere rather than cashmere blend and thus not actually competing with the coats the defendants were selling.

We disagree with the district court that the inference of injury is too attenuated here to warrant preliminary injunctive relief, for two reasons. First, we believe the district court gave too little weight to the members' interest in the reputation of cashmere and consequently to the propriety of granting injunctive relief when it is shown that a defendant is wrongfully trading on the established quality of another's product. Second, the court appears to have ignored the public interest purposes of the Lanham Act which requires a liberal interpretation of the irreparable injury factor.

There is considerable authority for the view that the irreparable injury requirement is satisfied once it is shown that the defendant is wrongfully trading on the plaintiff's reputation. *See Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746. In that case three South Dakota corporations, located in the Black Hills, and manufacturers of "Black Hills Gold Jewelry," three-color gold jewelry in a grape and leaf design, filed for an injunction under the Lanham Act to enjoin the defendants from using the words "Black Hills Gold Jewelry" to describe jewelry of a similar design, but not manufactured in the Black Hills. The district court found that there was a likelihood of confusion to consumers as to the origin of the products labelled "Black Hills Jewelry," that the plaintiffs had used this term to describe their product for over 100 years and that the defendants' use of the term would cause consumers wishing to purchase a product made in the Black Hills to purchase the defendants' product instead. The court held that this would allow the defendants to wrongfully profit from the plaintiffs' reputation and goodwill, and granted the injunction. On appeal, the Eighth Circuit rejected the defendants' argument that an inadequate showing of irreparable injury had been made, and affirmed the district court. 633 F.2d at 753.

The same approach has been taken in analogous cases of trademark law. In *Apple Computer, Inc. v. Formula International, Inc.*, 725 F.2d 521 (9th Cir.1984), the Ninth Circuit upheld the district court's grant of a preliminary injunction in favor of Apple, prohibiting Formula, a competing computer retailer, from using the trademark "Pineapple," or other trademarks confusingly similar to the trademark used by Apple, on its computer products. 725 F.2d at 527. The court held, citing *Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, that once Apple had demonstrated a likelihood of success on the merits of its trademark infringement claim, the district court could reasonably conclude that continuing infringement would result in loss of control over Apple's reputation and loss of goodwill. 725 F.2d at 526. It held this sufficient to establish a possibility of irreparable harm to Apple. *Id. See also Estee Lauder, Inc. v. Watsky*, 323 F.Supp. 1064 (S.D.N.Y.1970), which involved a request by Lauder for a preliminary injunction to enjoin the defendants from offering for sale imitations of Lauder's Youth Dew bath oil and Eau de Parfum spray. The court granted the injunction. It found that Lauder had shown a likelihood of success on the merits and held that it had, therefore, satisfied the irreparable injury requirement, noting that Lauder's reputation as a manufacturer of quality cosmetics was at stake as long as the spurious products were circulating. 323 F.Supp. at 1066. The court stated that such an exposure to forces beyond Lauder's control constituted irreparable injury, the consequences of which could not adequately be calculated at a later date in money. *Id.* at 1067.

The rationale for applying this standard of irreparable injury in trademark and similar cases was well stated by Judge Friendly in *Omega Importing Corp. v. Petri-Kine Camera, Co., Inc.*, 451 F.2d 1190 (2d Cir.1971). The Second Circuit there reversed the district court and ordered it to enter a preliminary injunction in favor of the plaintiff camera distributor prohibiting the defendant, a competing camera distributor, from distributing cameras bearing

identical names to those distributed by the plaintiff. Having determined that there was a high probability of consumer confusion between the plaintiff's and defendant's cameras, the court stated that "injury irreparable in the sense that it may not be fully compensable in damages almost inevitably follows." 451 F.2d at 1195. Judge Friendly explained:

> While an injured plaintiff would be entitled to recover the profits on the infringing items, this is often difficult to determine; moreover a defendant may have failed to earn profits because of the poor quality of its product or its own inefficiency. Indeed, confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Yet to prove the loss of sales due to infringement is also notoriously difficult. Furthermore, if an infringer's product is of poor quality, or simply not worth the price, a lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Id.* (citations omitted).

We hold that the plaintiff is entitled to preliminary injunctive relief. We are satisfied that the sale and manufacture of cashmere products by plaintiff's members establishes that they have an interest in the reputation of cashmere generally. It is but a short jump to the finding that their interest will be harmed if the defendants continue to sell the mislabelled coats. It may take some time before the effect of the sale of these coats translates into such an erosion of consumer confidence in all cashmere products as to cause the members to lose sales, but the likelihood of immediate sales loss is not the test for irreparable harm. By selling these coats with labels which overstate their cashmere content, defendants are wrongfully profiting from the reputation of cashmere as a high quality fabric, which plaintiff's members have a right to protect. The reputation of cashmere is put at stake as long as these coats are on the market and as explained by Judge Friendly in *Omega Importing Corp.*, 451 F.2d at 1195, a lasting but not readily measurable injury can be inflicted on a product's reputation by the circulation of counterfeit and, in this case, inferior products.

The second reason for disagreeing with the district court's conclusion that the likelihood of injury was too attenuated to justify a preliminary injunction is based on a line of authority holding that only a slight likelihood of injury need be shown to warrant injunctive relief when the defendant's representations are literally false. In *American Home Products Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978), the Second Circuit held, quoting 1 R. Callmann, *Unfair Competition, Trademarks & Monopolies* § 19.2(a)(1) (3d ed. 1967), that a court may grant relief on the basis of its own findings without reference to consumer reaction to the product when the defendant's representations are actually false; consumers' reaction is the starting point when the allegation is based merely on the tendency of the defendant's representations to deceive. *Id.* The Second Circuit has since confirmed this view in *Vidal Sassoon, Inc. v. Bristol-Myers Co.*, 661 F.2d 272 (2d Cir.1981). In that case the court held that the defendant shampoo manufacturer's advertising statement, that 900 women like Cristina Ferrare (a fashion model who starred on the defendant's shampoo commercial) had tried defendant's shampoo, could be enjoined without regard to consumer reaction, because only two-thirds of the women who tried the shampoo were adult women like Cristina Ferrare, as distinct from teenagers, and the statement was, therefore, facially false. 661 F.2d at 277. *See also Black Hills Jewelry Mfg. Co. v. Gold Rush, Inc.*, 633 F.2d 746:

> Since § 43(a) was passed as a consumer protection statute, the courts are not reluctant to allow a commercial plaintiff to obtain an injunction even where the likelihood of pecuniary injury to the plaintiff may be slight. Thus under § 43(a), Congressional policy appears to encourage commercial companies to act as the fabled "vicarious avenger" of consumer rights. An injunction, as opposed to

**16**

money damages, is no windfall to the commercial plaintiff. An injunction protects both consumers and the commercial plaintiff from continuing acts of false advertising.

*Id.* at 753 n. 7 (quoting J. McCarthy, *Trademarks & Unfair Competition* § 27.5A, at 250–51 (1973)). Thus, given our finding that the plaintiff had standing to sue because its members had a protectable interest in the reputation of cashmere, the district court's finding that it was probable that defendants' labels were literally false in itself warranted the grant of the injunction sought.

*Affirmed in part, reversed in part. Remanded for the issuance of a preliminary injunction against all defendants except Federated.*

Costs awarded to Federated in the appeal against it; costs awarded plaintiff-appellants against all other defendants.