**K–MART CORPORATION, Plaintiff,**

v.

**ORIENTAL PLAZA, INC., Defendant.**

**Civ. No. 88–1137(JP).**

United States District Court,
D. Puerto Rico.

Aug. 4, 1988.

Jorge I. Peirats and Edward M. Borges, O'Neill & Borges, Hato Rey, P.R., for plaintiff.

Carlos G. Latimer, San Juan, P.R., Eldia M. Díaz Olmo, Hato Rey, P.R., for defendant.

### OPINION, ORDER, AND PERMANENT INJUNCTION

PIERAS, District Judge.

This action arises from a disagreement over the terms and conditions of plaintiff K–Mart's lease at defendant Oriental Plaza Inc.'s shopping center outside Humacao, Puerto Rico. The Court's jurisdiction is based upon the complete diversity of citizenship of the parties plus the amount in controversy. 28 U.S.C. § 1332.

The plaintiff seeks to raze construction now in progress in the parking lot of Oriental Plaza. K–Mart avers that the structures going up were not contemplated by the original lease, that K–Mart has not

subsequently consented to their construction, and that their consent was required by the lease. K–Mart further avers that the construction is now injuring and shall in the future continue to injure K–Mart's goodwill; reduce the amount of "impulse shopping," upon which K–Mart claims it depends in part; result in a traffic flow dangerous to pedestrians immediately outside the K–Mart; reduce the number of "prime" parking places near K–Mart; obstruct the visibility from the road and destroy the desired identification of K–Mart as a store within the whole shopping center. The defendant, the landlord of the shopping center, has answered by alleging that further construction at Oriental Plaza was permitted by the lease, that the location of the further construction, albeit limited in the lease, was not specified, and that the present construction therefore runs afoul of no lease term. Alternatively, the defendant has answered that the plaintiff was forwarded a site plan in December 1986 that shows the location of the present construction. K–Mart never objected to this site plan. Oriental Plaza argues then that any challenge to this construction is barred by laches.

The Court finds that plaintiff is entitled to an injunction, although not the full relief requested.

## I.

Pursuant to Fed.R.Civ.P. 52(a), and after a consolidated preliminary and permanent injunction hearing held July 8, 11, and 13, 1988, the Court makes the following findings of fact and conclusions of law.

### A. *Findings of Fact*

1. Plaintiff K–Mart Corporation is a citizen of the State of Michigan, having both its site of incorporation and its principal place of business in that state. Defendant Oriental Plaza, Inc., is a citizen of the Commonwealth of Puerto Rico, having both its site of incorporation and its principal place of business here in Puerto Rico. The amount in controversy exceeds $10,000.00 exclusive of costs and attorney's fees.

2. Construction of Oriental Plaza began in the early 1970s. The two largest buildings, now occupied by K–Mart and a Pueblo Supermarket, were completed in 1982. The original occupant of the K–Mart building, a store called Barker's, left after going bankrupt.

3. The original configuration of Oriental Plaza is what is known in the trade as a "strip center." This refers to a line of small retail shops, assembled in a "strip," connecting two or more large retail stores, normally grocery or department stores. The large retail stores are called "anchors." A strip center differs from a shopping mall in that the entrances of all the small retail shops face the same way. In a shopping mall, the small retail shops face each other across an esplanade. At Oriental Plaza, the entrances of all stores face north.

4. K–Mart entered into negotiations with defendant Oriental Plaza, Inc., to acquire a leasehold in the Barker's site. The negotiations were carried out in New York City. The negotiating teams included, on K–Mart's side, Charles E. Lotzer, Jr., an official in the real estate department of K–Mart and Oriental Plaza's side, both the president of the corporation, Eduardo Ferrer Bolivar, and the manager, Ramon J. Ruiz. Both parties testified as to the negotiations leading to the lease. Lotzar's testimony, which the Court finds most credible, was that K–Mart would have preferred to prevent utterly further construction in the parking area. Some further development was accepted in the parking area as the "best we could do." Acquisition of the Barker's site was evidently a priority for K–Mart. During negotiations, building configurations besides what was shown on what became Exhibit B to the lease were brought up by Oriental. Lease Exhibit B is included as Appendix I to this Opinion, Order, and Permanent Injunction.* When the suggestion was made that the proposed buildings be erected further south, i.e., closer to the existing stores, Lotzer "objected to it violently." Such a prospect was

---

* Editor's Note: Appendix I omitted by the Court     for purposes of publication.

"totally objectionable." K–Mart's primary objections to any construction, and southerly construction especially, were the anticipated hampering of traffic and reduction of the visibility of K–Mart's facade and marque, as well as diminishing of available parking. According to Lotzer, whose testimony the Court credits, K–Mart wanted to place a "freeze" on further construction with the exception of that shown on Exhibit B of the lease.

5. An August 5, 1983, commitment letter from K–Mart was sent to the defendant. The commitment was conditioned on the execution of a lease within forty-five days of the letter. On August 12, 1983, Ferrer, as president of the defendant, returned an acknowledged copy of the commitment letter. In a cover letter accompanying that acknowledgment, Ferrer wrote:

K-mart is aware that the landlord plans to erect a 10,000 sq. ft. building [sic] in part of the parking area between the K–Mart space and Pueblo Supermarket. K–Mart has a copy of the plans for that structure.

6. The lease was executed on September 21, 1983. The lease described the demised premises by reference to an exhibit to the lease, Exhibit B. Exhibit B is a photo-reduced site plan of Oriental Plaza. Other pertinent sections of the lease provide as follows:

8. *Parking and Other Common Areas:*

8.1 During the term of this lease the Common Area shall be sufficient for the parking of not less than four hundred forty-three (443) standard size American automobiles ... The layout of, and striping in, the Common Area, as depicted on Exhibit B, shall not be changed without Tenant's consent ...

9. *Landlord's Representations and Warranties*

9.1 ... Landlord further covenants that it will not erect hereafter any buildings or other structures on the lands described in Exhibit A [1], except as shown in Exhibit B ...

.     .     .     .     .

42. *Entire Agreement*

This lease contains the entire agreements between the parties and cannot be changed, modified or amended unless such change, modification or amendment is in writing and executed by the party against which enforcement of the change, modification or amendment is sought.

7. The lease also contains Exhibit B–1. Exhibit B–1 is a photo-reduction of the same site plan as Exhibit B. Exhibits B and B–1 differ in the following respects:

a. Exhibit B–1 contains the typewritten annotation "Proposed free-standing unit of appr. 10,000 sq. ft.," immediately below the compass indication in the upper right-hand corner of the site plan. Exhibit B contains the same annotation, with a handwritten gloss changing it to read "Proposed free-standing units of appr. 10,000 sq. ft. total maximum." Both annotations accompany a line drawn to indicate two buildings on the site plan. The buildings abut the northern perimeter of the site, along Puerto Rico Route 908.

b. On Exhibit B, the two westernmost rows of parking spaces are lined through and the handwritten notation "Truck Sale Area" is written above. An indicating arrow is drawn from those words to this western parking area. On Exhibit B–1, the entire parking area north of the K–Mart, extending to a line drawn north from the eastern wall of the store, is shaded with diagonal lines. A handwritten notation makes reference to "Paragraph 18.2." Paragraph 18.2 of the lease states, in pertinent part:

In the event that ... more than 20% of the Shopping Center land immediately north of Tenant's Building as shown on Exhibit B–1 shall be expropriated by public or quasi-public authority, Tenant shall have the option to terminate this lease. . . . .

8. On February 27, 1986, Ruiz, the general manager of Oriental Plaza, wrote to Lotzer. The letter stated that Oriental had submitted plans to the Planning Board of

---

**1.** Exhibit A is a metes and bounds description of the lands on which Oriental plaza sits.

Puerto Rico "for approximately 9,000 square feet of free standing units, as show as Exhibit 'B' of the lease contract." According to the letter, the units were to be fast food operations. The letter continued:

> For this reason we would appreciate a letter from K–Mart acknowledging the acceptance of the facilities so long they are [sic] constructed within the limits established by the exhibit mentioned above.

Lotzer testified that this letter was a "red flag" to him. The letter caught his eye because "Why should they ask permission for something they were already authorized to do?"

9. On March 11, 1986, Lotzer responded to Ruiz' February 27, letter. That letter requested a site plan for the free standing units proposed in the Ruiz' February 27 letter. On March 13, Ruiz forwarded the site plan. By letter of March 19, 1986, Daniel H. Burdick II, another official of the real estate division of K–Mart, rejected the plan. The letter read, in part "the plan has been reviewed and we cannot approve your revised plan for the outlot arrangement."

10. On April 1, 1986, Burdick sent an intracorporate memorandum to an official of the design division of K–Mart. That memorandum accompanied yet another site plan submitted by Oriental. By intracorporate memorandum of April 7, 1986, the design division responded with no basic objections to the proposed site plan. That proposed site plan (the "April 1986 plan"), introduced as defendant's Exhibit N, differed from lease Exhibit B in the following respects:

a. An entrance from P.R. Rt. 908 directly into the shopping center was added on the north boundary of Oriental Plaza. This proposed entrance was nearly equidistant from the northeast and northwest corners of Oriental Plaza.

b. The two proposed north buildings changed shape slightly from that shown on lease Exhibit B and were moved to the east of the new entrance, i.e., farther away from K–Mart. The two buildings remained, however, directly against the north boundary of Oriental Plaza.

11. According to the testimony of both defendant's president and general manager, construction was never begun on this site plan because the Puerto Rico Planning Board did not consent to the direct access to P.R. Rt. 908.

12. On December 29, 1986, Ruiz wrote again with another site plan. This letter was addressed to one Cesar Rodríguez, who, at the time, held the title of "Regional Real Estate Director" at K–Mart. The second paragraph of that letter reads:

> The entire parking area has been redesigned and the count will be 550 which is 107 cars more than K–Mart requires in the lease. Please take note of the bank location circled in red. The same does not hamper in any way the traffic flow especially when your immediate parking has never been more than 60% full even in the busiest days. Visibility is the same with exposure unaffected from all sides.

The site plan showed a structure, labelled "Bank," of 1,200 square feet. This bank was north of the northwest corner of the K–Mart. The site plan also showed structures similar to those presently under construction. The cover letter does not direct the reader's attention to these other structures.

13. Rodríguez wrote back on January 15, 1987. Rodríguez indicated that he had forwarded the site plan to the design division and was awaiting their comments. The letter continued

> In connection with the proposed bank, our consent to same will be conditioned upon:
> 1. A review of the impact of the bank on K mart [sic] parking and whether the same would be acceptable.
> 2. The proposed "economics" and how K mart will benefit therefrom.

Rodríguez made no comment on the other structures shown on the site plan. Ruiz never responded in writing to Rodríguez' request.

14. On November 2, 1987, Rodríguez sent Ruiz another copy of his January 15 letter. This November 2 letter reiterated

Rodríguez' request for information on the economic benefit that would inure to K–Mart. The letter further proposed that K–Mart receive, in exchange for its approval of outlot development, 50% of the rental receipts on that development.

15. The bank has not been built. The president of Oriental Plaza testified that the reason the bank was never built was because of the 50% rental split proposed by K–Mart. Ferrer testified that this proposal made the development economically unfeasable. Oriental nevertheless went ahead with construction of the other structures shown.

16. Rodríguez testified that he made no comments on the rest of the site plan because the letter concerned the bank. Rodríguez further testified that his experience with the K–Mart Corporation was that a change to a site plan during a lease would result in either a letter agreement or a lease amendment. Neither side produced such a letter or amendment.

17. K–Mart held a $300,000.00 mortgage on the property of Oriental Plaza, subject to a first mortgage in favor of Chase Manhattan Bank and a second mortgage in favor of the Royal Bank of Canada. In early 1988, K–Mart subrogated its third mortgage to a fourth position. The new third mortgage was in favor of a Florida bank. The funds loaned as part of that mortgage, $330,000.00, are being used to finance the present construction. Although the subrogation agreement was not offered in evidence, representatives from both parties testified to these terms. Rodríguez, on behalf of K–Mart, testified that he saw no site plans in connection with K–Mart's subrogation. Rodríguez, whose testimony the Court fully credits, stated that Ruiz informed him that the financed construction would be that which had been approved by Lotzer. The only construction Lotzer approved was that shown in lease Exhibit B.

18. The present construction consists of three buildings. A photo-reduced site plan of the present construction is included as Appendix II to this Opinion, Order, and Permanent Injunction.** The south wall of the southernmost building lies on a line extending east from the north wall of the K–Mart. The southwest corner of the southernmost building is approximately 32 feet directly east of the northeast corner of the K–Mart. Along K–Mart's eastern wall there is also a sidewalk approximately 10 feet wide.

19. The Court received testimony from persons with particular expertise in the arcane subjects of shopping centers and traffic flow. The witnesses testified that the space contemplated between the sidewalk on K–Mart's eastern side and the southermost building would be barely adequate to allow two automobiles to pass side by side. According to testimony, one of these lanes would likely be occupied, in the normal course of business, by automobiles in line for the drive-through of the new northwest building, an outlet of the Church's Fried Chicken chain.

20. The combined square footage of the three buildings under construction is 10,800 square feet, divided as follows: Church's (northwest building) 1,900 square feet; Burger King (northeast building) 2,500 square feet; south building (no tenants) 6,400 square feet. The combines square footage exceeds the figure in lease Exhibit B as well as defendant's admissions that the lease allowed them to construct only a "total maximum" of 10,000 square feet of the free standing units.

21. The Court received extensive photographic evidence from both parties. The Court also received testimony concerning the relative desirability and undesirability of lines of sight, the concept of "presence" evoked by a large structure with an identifying logo clearly visible, and the effect of this on both goodwill and "impulse shopping." Although the construction now in progress does not completely obstruct the building, it does nevertheless slightly impede the view of the K–Mart logo on the eastern wall of the building. All views from the east of the north logo over K–Mart's entrance are completely obscured

** Editor's Note: Appendix II omitted by the    Court for purposes of publication.

by the construction. Furthermore, the K–Mart no longer has the brooding presence it obviously possessed before construction began. The Court credits the testimony of plaintiff's expert, also by the name of Ruiz, that without the high visibility that this K–Mart store once possessed, impulse sales will suffer. The Court acknowledges that K–Mart, in the lease, did agree to construction that would in some way interfere with all possible views of K–Mart. To the extent, however, that the present construction is much farther south, and therefore closer to the existing stores, a fortiori the visibility of the K–Mart is restricted to a much greater extent than agreed to.

22. The Court also received testimony concerning "prime" parking space. Prime parking space, also called "high density parking," are those spaces that have a high turnover rate and that are closest to the greatest number of retail outlets. Parking directly in front of the retail strip is more highly regarded than parking in the northwest corner of the lot, for example. K–Mart, relying as it does in some measure, on impulse shopping, values these prime parking spaces. To the extent that prime parking is lost, impulse sales will suffer. From the site plans presented in evidence, the Court can see that approximately forty parking spaces directly in front of the retail shops disappear under the present construction. These are prime locations, because of their approximate equidistance to both the K–Mart and the Pueblo, as well as their closeness to the strip stores.

23. From the photographic evidence, site plans, and testimony of witnesses, the Court has come to understand the psychology of shopping centers. Aesthetically, the present construction dismembers the strip center. Any unity of purpose in the configuration of these retail stores is obliterated by the clumsy placement of three disjointed buildings in the middle of the parking lot. The Court credits the testimony of plaintiff's expert in this regard. The presentation of K–Mart as a store is adversely affected by these buildings. The impact on the important impulse shopping has been clearly shown. The decision to enter a shopping center is difficult enough without removing the major incentive, the sight of the K–Mart rising from Oriental Plaza.

24. The Court has likewise received credible evidence from officials of the K–Mart Corporation on the features K–Mart finds desirable and how markedly those features are now lacking as a result of the present construction at Oriental Plaza.

### B. *Conclusions of Law*

On the third day of the hearing in this case, the Court consolidated the preliminary injunction hearing with the trial on the merits. Fed.R.Civ.P. 65(a)(2). It was apparent that all material information was coming before the Court without needlessly expensive and consuming discovery. Both parties were well prepared as to the facts and all of the major players in this dispute testified. It further appeared to the Court that the relief requested as a preliminary injunction is quite permanent in nature: razing the buildings.

■ The Court first comes to the following conclusion: Defendant Oriental Plaza has breached its lease with K–Mart. K–Mart acquiesced to the future construction of 10,000 square feet of freestanding retail shops. That agreement succinctly described the permitted construction of those shops "as [that] depicted on Exhibit B." The lease stated simply that "the layout ... shall not be changed without Tenant's [K–Mart's] consent." The present construction violates the lease in two respects. First, the total floor space of the three buildings under construction exceeds by 800 square feet that allowed in the lease. Second, the construction is not in the location depicted in lease Exhibit B. The contract having been breached, the Court must determine the appropriate remedy.

Plaintiff's argumentation, up to the point that the Court consolidated the hearing, was that K–Mart was entitled to a preliminary injunction. This Court may grant such an injunction if we find that (1) without relief the plaintiff shall suffer irreparable injury; (2) the injury suffered by plaintiff outweighs any harm that may befall

defendant by reason of the injunction; (3) the public's interest is consonant with the injunction; and (4) the plaintiff has exhibited a likelihood of success on the merits. *United Steelworkers v. Textron, Inc.*, 836 F.2d 6, 7–8 (1st Cir.1987); *Hypertherm, Inc. v. Precision Products, Inc.*, 832 F.2d 697, 699 (1st Cir.1987); *Camel Hair & Cashmere Institute v. Associated Dry Goods Corp.*, 799 F.2d 6, 12 (1st Cir.1986). Because "the merits" were consolidated into the hearing held in this case, this last factor drops out. The remaining three represent the traditional equitable analysis that the Court employs.

■ In this case, the harm being done to K–Mart is irreparable. K–Mart cannot recoup, even through legal damages, the injury to its goodwill caused by the visual obstruction of its store. Goodwill, although an intangible asset, is nevertheless an asset. By its nature, damage to goodwill falls in a very grey, but very real, world where specific losses cannot be shown on a balance sheet. These losses, however, can turn from grey to red. Goodwill is protected by the courts, despite its difficult quantification. *Camel Hair*, 799 F.2d at 15–16 (injunction upheld in trademark violation case where irreparable injury shown by injury to reputation). The testimony of plaintiff's officers convincingly demonstrated to the Court that this large, national retail chain store knew the value of its name and knew how to protect and promote that name. The motivation behind the restrictions on defendant's further construction was to ensure the continued visibility, the continued "presence," of the store.

In *Camel Hair and Cashmere Institute v. Associated Dry Goods*, the United States Court of Appeals for the First Circuit examined the denial of a preliminary injunction by a district court. A trade association sought injunctive relief against several department stores. The stores were marketing coats that the Institute believed contained a substantially lower cashmere content than was described on the coats' labels. In examining the irreparable harm facet of the injunction analysis, the *Camel*

*Hair* court held that the reputation of cashmere manufacturers, who the Institute represented, was irreparably harmed by the circulation of falsely labelled and inferior products. *Camel Hair*, 799 F.2d at 14–15.

The First Circuit, in *Camel Hair*, also noted that "the likelihood of immediate sales loss is not the test for irreparable harm." *Id.* at 15. In this case, however, and in addition to the inevitable loss of sales that defendant's construction will cause, K–Mart faces worse than mere loss of sales. The Court received testimony concerning the kind of surroundings that K–Mart bargains for when opening stores. The surroundings K–Mart seeks maintain K–Mart's "presence" within a strip center. K–Mart seeks uniformity of appearance, within parameters, for all of its stores across the country. This uniformity of appearance is part and parcel of the presentation of the store to the public and it is this presentation that defendants have irreparably harmed. Mere damages for lost sales cannot replace this.

There is a countervailing burden upon defendant. Should the Court issue this injunction, Oriental Plaza will lose whatever rental receipts it hoped to gain from the retail space being constructed. Defendant will also incur expenses in the razing of the construction. The construction is financed at approximately $330,000.00. The Court takes all of this into consideration in a measured exercise of its equitable power. The injunction shall not permanently deprive defendant of all prospective revenues, and shall require a certain expenditure in razing part of the construction. The Court makes this balancing in light of the fact that defendant's actions are a clear breach of the lease. Although the doctrine of "unclean hands" is usually reserved for an examination of whether the party seeking relief is entitled to it, the Court, sitting here in equity, cannot allow defendant to profit by its wrongful acts. On balance, the Court finds that the plaintiff is entitled to relief, although that relief will not be all plaintiff has requested.

The public interest affected by this commercial dispute is not large, but it is

present. The public is interested that contracts are honored, for this is a nation of laws, not men. That the restoration of K–Mart's visibility by the issuance of this injunction will give the public one more choice in fulfillment of its consumer wants and desires could be characterized as "in the public interest," although this affects more directly K–Mart's selfish mercantile interests. On the other hand, the public will lose the choices of whatever retail outlets will be prohibited by this injunction. On balance, this is not of sufficient significance to bar the issuance of an injunction. The Court also received credible testimony concerning traffic congestion and pedestrian safety at the northeast corner of the K–Mart store. The Court recognizes this as a public interest served by the issuance of the injunction. The public interest is not adversely affected by this injunction. If at all, the public's interest is served by the enforcement of the lease.

Defendant Oriental Plaza has attempted to raise the equitable defense of laches. Oriental contends that a site plan detailing the present construction was forwarded to K–Mart in December 1986. That site plan, defendant's Exhibit O, is described in Finding of Fact paragraph 12. Defendant argues that plaintiff's lack of opposition to that site plan constitutes acquiescence such that laches bars plaintiff from complaining of the construction approximately one year and one-half later.

■ The Court is not convinced by this argument. To begin, defendant's Exhibit O does not accurately depict the construction. In defendant's Exhibit O, the southernmost building under construction occupies 5,000 square feet. The southernmost building occupies 6,400 square feet. That extra space lies to the west of Exhibit O's western wall, creeping that much closer to the K–Mart store. Second, and most convincingly, is the plain language of the lease that precludes this argument that "silence gives consent." Article 42 of the lease states:

> This lease ... cannot be changed, modified or amended unless such change, modification or amendment is in writing

and executed by the party against which enforcement of the change, modification or amendment is sought.

Even assuming that K–Mart received notice of the proposed construction through the December 1986 site plan, K–Mart did not execute any change, modification, or amendment of the lease based on that plan. Oriental and K–Mart demonstrated that they knew how to modify the configuration of lease Exhibit B. In Article 18 of the lease, the parties made contingency plans in case a public or quasi-public authority exercised the power of eminent domain over lands described in lease Exhibit B. *See* Finding of Fact ¶ 7. In April 1986, Oriental submitted modified site plans and K–Mart returned its approval in writing. No such procedure was even attempted with this December 1986 plan. Defendant's laches argument fails.

## II.

■ The Court is wary, however, of granting plaintiff the totality of the relief requested. K–Mart, after all, knew that some day some construction would take place. K–Mart approved of some construction when it negotiated and signed the lease. While concerns about visibility, parking, and safety are certainly valid, the Court cannot see reducing all three buildings to rubble and starting again. The Court has seen and carefully evaluated the visual impact of the construction on K–Mart and the whole of Oriental Plaza. It is the southernmost building, not the northeast and northwest structures, that is the offending member. The Court wishes to remedy the defendant's breach with a scapel, although we know that real sledgehammers must be used. The southernmost building must go and parking restored. Accordingly, the Court ORDERS, ADJUDGES, AND DECREES the following:

1. Defendant Oriental Plaza shall, within thirty (30) calendar days of the issuance of this injunction, RAZE TO THE GROUND the southernmost building of 6,400 square feet, depicted on Appendix II to this Opinion, Order, and Permanent Injunction.

2. Defendant Oriental Plaza shall RE-PLACE this razed structure with parking facilities to accomodate no fewer than thirty (30) standard-size American-made automobiles. The parking facilities shall be put in place within sixty (60) calendar days of the date of issuance of this Opinion, Order, and Permanent Injunction.

3. Defendant Oriental Plaza, Inc. is hereby PERMANENTLY ENJOINED from any further construction in the parking area or change in the parking configuration of Oriental Plaza except as provided in Articles 9.1 and 42 of the lease between Oriental Plaza Inc., and K–Mart, or as provided in this Opinion, Order, and Permanent Injunction.

4. Defendant Oriental Plaza shall bear the whole cost of this razing and restoration, and is PERMANENTLY ENJOINED from directly or indirectly passing any portion of these costs onto plaintiff K–Mart Corporation.

5. Defendant Oriental Plaza shall be allowed to complete construction of the northeast and northwest structures depicted on Appendix II to this Opinion, Order and Permanent Injunction, including "drive-through" food service facilities.

6. This Opinion, Order and Permanent Injunction is enforceable under penalty of contempt of Court. The parties shall notify the Court, by informative motion, supplemented with necessary documentary or testimonial evidence, when the dictates of this Opinion, Order, and Permanent Injunction have been carried out.

7. All other claims for relief are DISMISSED.

The Clerk shall act accordingly.

SO ORDERED AND ADJUDGED.