**BLUE BELL CO. et al.**

v.

**FRONTIER REFINING CO. et al.**

**FRONTIER REFINING CO.**

v.

**BLUE BELL CO. et al.**

Nos. 4720, 4721.

United States Court of Appeals,
Tenth Circuit.

May 25, 1954.

Rehearing Denied June 21, 1954.

———◆———

W. Alan Thody, Los Angeles, Cal. (Zimmerman, Kelly & Thody, Los Angeles, Cal., L. Delos Daines, Salt Lake City, Utah, on the brief), for appellant and cross-appellees.

Paul H. Ray, Salt Lake City, Utah (Dennis McCarthy, Salt Lake City, Utah, was with him on the brief) for Standard Oil Co. of California, The California Co., Salt Lake Refining Co. and Standard Oil Co. of California.

Shirley P. Jones, Salt Lake City, Utah (Shirley P. Jones, Jr., Philip A. Mallinckrodt, Salt Lake City, Utah, on the brief), for Frontier Refining Co.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

MURRAH, Circuit Judge.

This is an appeal from a judgment of the District Court of Utah, in an action by the Frontier Refining Company against Blue Bell Company of Idaho and Blue Bell Company of Utah, for infringement of its trade-marks, and for unfair competition, in which Frontier sought injunctive relief and recoverable profits from the use of such trade-marks and unfair competition; and in which Blue Bell Companies cross-complained against Frontier and the Standard Oil Company of California, a Delaware corporation, the Standard Oil Company of California, a Utah corporation, Salt Lake Refining Company and the California Company (all affiliates of Standard of Delaware), claiming damages for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2.

On a trial of the case to the court and advisory jury, the trial court directed a verdict for the cross-defendants on the antitrust issues, held for Frontier on the trade-mark and unfair competition issues, and submitted the case to the jury on recoverable profits for infringement. The jury returned separate verdicts against the Blue Bell Companies for the profits derived from the sale of gasoline by Blue Bell of Idaho in Idaho, and Blue Bell of Utah in Utah. The order of proof was first on the issue of infringement and profits, but on appeal, Blue Bell first assails the judgment of the court on the directed verdict on the antitrust issues, and we will treat the appeal in that order. The facts pertinent to those issues may be stated as follows:

Upon its organization in 1941, the Frontier Refining Company adopted a trade-mark and immediately registered it in the states of Wyoming, Colorado, Utah, Idaho, New Mexico, Kansas, Nebraska, South Dakota and Montana, in all of which states (except Idaho) it was licensed to do business. It acquired an oil and gas refinery at Cheyenne, Wyoming, and at the time of the trial of the case had between three hundred and fifty and four hundred retail outlets in the states in which it was licensed to do business.

To facilitate the supply of gasoline to its jobbers and retail outlets over its trade territory, Frontier entered into exchange agreements with other refineries, under which it made gasoline available to its competitors in Cheyenne in exchange for gasoline delivered at the competitors' refinery for distribution to Frontier's dealers and jobbers in that area. For a number of years, Blue Bell of Idaho has been engaged in the wholesale and retail gasoline business in Idaho and at Logan, Utah, and since 1944 purchased gasoline from Frontier at Sinclair, Wyoming, for its outlets in Utah and Idaho. This gasoline was unbranded and was sold from Blue Bell's pumps bearing its own brand or label. In the Spring of 1949, Frontier entered into an exchange agreement with the California Company, whereby Frontier

made five million gallons of gasoline per year available to Standard at Cheyenne, Wyoming, in exchange for five million gallons of gasoline per year made available to Frontier at Salt Lake City. This agreement was made by the California Company through its parent, the Standard of Delaware, which in turn controlled the Salt Lake Refining Company, where the gasoline was to be lifted.

The exchange agreement provided for what is known in the industry as a place differential of 1¢ per gallon, payable to Standard by Frontier for the gasoline lifted at Salt Lake City. This place differential was predicated upon the assumption that gasoline delivered under the agreement to Frontier at Salt Lake City was worth more than the gasoline delivered to California at Cheyenne because of the haulage factor involved in the distribution of gasoline. In other words, the exchange agreements took into consideration the cost of transporting the gasoline from the respective refineries to the points of distribution, allowing the long-haul taker a place differential. And, Frontier had other like agreements with other refineries in its trade territory.

Consistently with that trade policy, the California Company also had an exchange agreement with Carter Oil Company, under which Carter furnished California five million gallons of gasoline per year at its Billings, Montana refinery and three million gallons at its Cut Bank, Montana, refinery, in exchange for a like amount of gasoline delivered to Carter through Salt Lake Refining Company at its refinery in Salt Lake City. While the agreement did not expressly so provide, it was understood that the gasoline lifted by Carter was to be used to supply Carter's outlets in Southeastern Idaho, and in consideration of the haulage factor thus involved, California agreed to pay Carter a ½¢ per gallon differential for all gasoline lifted at Cut Bank, provided however, that if California could make Carter's gasoline available from its pipe line ter-

minals in Idaho, the place differential would not be payable.

Soon after the five million gallons of gasoline became available to Frontier at Salt Lake City, and in the Spring of 1949, Frontier entered into an oral arrangement with Blue Bell of Idaho, under which two hundred thousand gallons of gasoline per month were allotted to Blue Bell on Frontier's account with Standard on the basis of 12.9¢ per gallon at the Salt Lake City refinery. At the same time, it was orally agreed between the parties that this gasoline would be sold under the Frontier brand and trade-mark to Blue Bell's jobbers and dealers in the states of Idaho and Utah; and Frontier immediately made available to Blue Bell all of its advertising material, including signs, globes, uniforms, matches and road maps. Blue Bell thereupon discontinued the use of its labels and insignias and adopted Frontier's brands, labels and advertising, and generally held itself out in Idaho and Utah as the distributor for Frontier petroleum products.

Soon after the arrangement, the managing officer of Blue Bell began complaining about price. He contended that he could buy gasoline cheaper elsewhere, and that he was not being treated equitably. Frontier refused to accede to his demands, and early in the Spring of 1950, Blue Bell began lifting gasoline at Standard's Salt Lake refinery on Carter's account under its exchange agreement with Standard. Upon learning that such gasoline was being distributed in the Salt Lake area, California inquired of its affiliate whether there had been any change in the Carter exchange agreement. When Carter was confronted with the information that the gasoline was being lifted on its account for distribution in the Salt Lake City area, it immediately acknowledged its mistake, and on February 27, 1950, an officer of the parent California company sent a telegram to the refinery directing it not to deliver any more gasoline on Carter's account for distribution in

Utah, but to continue delivery on Carter's account for distribution in Southeastern Idaho. At the same time, relations between Frontier and Blue Bell having deteriorated to the point where Blue Bell was taking only a small part of its allotment on the Frontier account, and within two hours of the Standard wire, Frontier directed the refinery not to deliver any more gasoline to Blue Bell on its account. Thereafter, Frontier delivered no more gasoline to Blue Bell and demanded the return of all of its advertising and trade-mark equipment, and that it sell or distribute no more gasoline under the Frontier brand. When Blue Bell continued to operate under the Frontier brand in Idaho, and as the Frontier Oil Company in Utah, Frontier brought this suit.

In its cross-complaint, Blue Bell pleaded the exchange agreements, and then alleged that prior to February 27, 1950, Blue Bell had been underselling California in the Salt Lake City area; that Frontier and California, through its affiliated corporations, threatened to take action against Blue Bell unless it raised its price; that California and Frontier thereupon agreed not to sell Blue Bell any more gasoline through the account of Frontier or any other connection through which Blue Bell might be able to obtain gasoline, and unsuccessfully endeavored to induce Carter to enter into the agreement; that in pursuance of this agreement, Frontier and Standard simultaneously cut off Blue Bell's supply of gasoline at the Salt Lake City refinery. The simultaneous cut-offs were alleged to have been done to enforce contracts in restraint of trade and in an attempt to monopolize trade and commerce; and in furtherance of a combination and conspiracy to restrain and monopolize trade and commerce in the sale, distribution and marketing of petroleum products among the several states.

As we summarize the complaint and the contentions of Blue Bell, they are to the effect that the exchange agreements were concertedly utilized to restrict the destination of five million gallons of gasoline, thereby enabling the conspirators to fix and maintain the price of gasoline moving in interstate commerce; eliminate competition; and divide trade territories to the public detriment and to Blue Bell's damage.

The prohibitions of Sections 1 and 2 of the Sherman Act are aimed at all contracts, combinations or conspiracies, which by reason of their purpose or effect tend to prejudice the public interest by unreasonably restraining interstate trade and commerce, or which attempt to monopolize such interstate trade and commerce. Shotkin v. General Electric Co., 10 Cir., 171 F.2d 236, and cases cited. See also Apex Hosiery Co. v. Leader, 310 U.S. 469, 499, 60 S. Ct. 982, 84 L.Ed. 1311; Appalachian Coals, Inc., v. United States, 288 U.S. 344, 359, 53 S.Ct. 471, 77 L.Ed. 825. And, any such contract, combination or conspiracy having for its purpose or potential effect the fixing of prices of goods moving in interstate commerce; eliminating competitors from a substantial market; or which divides interstate trade territories, is unreasonable, hence illegal per se. Shotkin v. General Electric Co., supra. See also United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377, 71 L.Ed. 700; Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 458, 60 S.Ct. 618, 84 L.Ed. 852; United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 212, 60 S.Ct. 811, 84 L.Ed. 1129; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219; Fashion Originators' Guild v. Federal Trade Commission, 312 U.S. 457, 668, 61 S.Ct. 703, 85 L.Ed. 949; International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L. Ed. 20; United States v. Addyston Pipe & Steel Co., 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136; Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199; Associated Press v. United States, 326 U.S. 1, 15, 65 S.Ct. 1416, 89 L.Ed. 2013. But, a mere declination to sell to competitors or to supply retail outlets in a com-

petitive market is not illegal, unless such refusals to sell or supply can be shown to be in furtherance of a contract, combination or conspiracy to unduly suppress the free flow of trade or commerce. Shotkin v. General Electric Co., supra; United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 722, 64 S.Ct. 805, 88 L.Ed. 1024.

We do not understand Blue Bell to assail the exchange agreements as illegal per se. They do earnestly contend, however, that when utilized to restrict the interstate movement of five million gallons of gasoline per year, they become instrumentalities for the illegal suppression of interstate trade and commerce; that the facts and circumstances leading up to and including the simultaneous cut-offs on February 27, 1950, are entirely sufficient to establish a prima facie case of a combination and conspiracy to fix prices, eliminate competition and divide up markets; that a prima facie case having been thus established, it should have been appropriately submitted to the jury with the further instruction that if any such combination or conspiracy was found to exist, it would be unreasonable per se, and the jury should then proceed to consider and determine the amount of recoverable damages. Of course a directed verdict was not warranted unless we can say that there was no evidence from which a jury could rationally infer an illegal combination or conspiracy as alleged.

The underlying purpose and effect of the exchange agreements are too plain for doubt. In the first place, they were obviously entered into in order to facilitate competition, not to stifle it. They permitted one marketing company to do business at the back door of its competitor's refinery by the exchange of manufactured products. The price differential based upon place of distribution or sale was nothing more than a recognition of the cost of transportation from the refinery to points of distribution. Based upon these economic realities, Frontier agreed to pay California

1¢ more for gasoline delivered at Salt Lake City than gasoline delivered at its refinery at Cheyenne, and California agreed to pay Carter ½¢ more for gasoline delivered at Cut Bank than gasoline delivered to Carter at Salt Lake City for distribution in Southeastern Idaho. So long as Carter's gasoline was used in Idaho, the economic scales were balanced, and sale by Carter in the Utah area unbalanced the equitable adjustment manifest in the exchange agreement.

We can see nothing illegal in this arrangement, nor can we find anything sinister in California's refusal to sell gasoline to Blue Bell on Carter's account for resale in Utah, when to do so would violate the underlying reasons for the place differential. Carter was free to sell the exchange gasoline to whomsoever it pleased for distribution in any trade territory, so long as it respected the place differentials. If, however, it chose to sell its gasoline for distribution in the Salt Lake City trade territory, it had to forego the place differential conditioned upon the long haul to Southeastern Idaho. It could not violate the integrity of that agreement by selling it to someone else for distribution in the trade territory. Carter so interpreted the agreement and chose to abide by it by discontinuing sales for distribution in the Salt Lake City area. And, it is significant that Carter is not charged with the taint of the alleged conspiracy, indeed it is explicitly exonerated. It is difficult to discern in the circumstances how Frontier and California could be guilty of a combination or conspiracy without Carter's conscious complicity.

There was some intimation that Blue Bell was considered a price-cutter in the Salt Lake City area, and that the simultaneous cut-offs were used to police the gasoline prices in that area. But Blue Bell's managing officer testified that he did not know whether he undersold his competitor in this area prior to the cut-off. He did testify that subsequent to the cut-offs, he continued to obtain an adequate supply of gasoline; more than

doubled his gallonage in the Utah area during the succeeding year, and was able to undersell his competitors. The undisputed facts are that Frontier had an arrangement with two distributors to take the allotted supply of gasoline at Salt Lake City under its exchange agreement with California. When Blue Bell ceased to take but a very small part of its allotment, Frontier ascertained that the other distributor was willing to take the entire supply and the so-called cut-off followed. Viewed in the light of these undisputed facts, the coincidence of the two cut-offs loses its probative value as evidence of the existence of an agreement, combination or conspiracy to restrain or monopolize interstate trade or commerce.

There is no evidence in this case of the exercise of leverage of contracts resting upon the fulcrum of the control of the available supply of gasoline as a means of controlling prices and suppressing competition as in Ethyl Gasoline Corp. v. United States, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852. See also United States v. Bausch & Lomb Optical Co., supra. Or, as a means of dividing trade territories as in United States v. Trenton Potteries Co., supra.

■ We agree with the trial court that there was no evidence to submit to the jury on the antitrust issues.

Blue Bell's attack on the judgment of the court holding the trade-mark valid and infringed, and awarding damages for profits, is about three-fold: (1) the trade-mark is said to be invalid; (2) if valid, uninfringed; and (3) if valid and infringed, it was with the consent and acquiescence of Frontier, amounting to an estoppel.

Frontier's adopted trade-mark depicts the figure of a buckaroo on a rearing horse, with the words "Rarin' To Go" immediately underneath, encircled on the outer border by the words "Frontier" and "Gas", separated on either side of the border by two stars. And, it also uses the numeral "90" on its insignia to indicate the quality of its premium gasoline. The predominate features of the marks are the words "Frontier" and "Rarin' To Go" used in connection with the buckaroo on a rearing horse. This composite circular insignia was used consistently and industriously to advertise the sale of Frontier Refining Company's petroleum products in all of its trade territories.

■ The word "Frontier" is said to be in the public domain as having only a geographical significance, and the numeral "90" merely descriptive. But, "It is a fallacy to break the fagot stick by stick." Joseph Schlitz Brewing Co. v. Houston Ice Co., 250 U.S. 28, 39 S.Ct. 401, 63 L.Ed. 822. The question whether a trade-mark is distinctively valid depends upon a consideration of its elements as a whole, not its dissected parts. Nims Unfair Competition and Trade-Marks, 4th Ed., Sec. 201, pp. 537, 540; Restatement on Torts, Sec. 724.

The trial court found that from the time of Frontier Refining Company's adoption and first use of the circular insignia to symbolize its products, there was no other use of any similar design, either as a business name or as a trade-mark, in or adjacent to Frontier's trade area in the Western part of the United States, and particularly in the states in which Frontier did business, except by Frontier's authorized distributors and dealers.

■ Notwithstanding the descriptive character of the word "Frontier" and numeral "90" as components of this composite mark, we think the word and numeral have become so closely associated with the petroleum products of the Frontier Refining Company as to acquire a secondary meaning in the trade territory involved. Cf. Standard Oil Co. v. Michie, D.C., 34 F.2d 802; Standard Oil Co. of New York v. Standard Oil Co. of Maine, D.C., 38 F.2d 677, affirmed, 1 Cir., 45 F.2d 309. See also Nims, supra, § 36, p. 152. The use of the word "Frontier" on any other petroleum products sold in this particular trade territory would undoubtedly tend to confuse or even deceive the passing motorist who depends upon symbols to

identify the source and quality of petroleum products he purchases. Considered as a whole, the mark is original with Frontier Refining Company; it is unique and distinctive in its design, and has been thoroughly and assiduously exploited as a symbol of Frontier Refining Company's products. We agree with the trial court that the trade-mark is valid and that it belongs to the Frontier Refining Company.

On the issue of infringement, Blue Bell of Idaho takes the position that it first used the Frontier mark in the state of Idaho with the full knowledge, consent and acquiescence of Frontier; that although Frontier registered the mark in Idaho in 1941, it never sold any of its products under the mark in that state, except through Blue Bell of Idaho until 1953; that Blue Bell of Idaho therefore acquired the exclusive right to the use of the trade-mark, and Frontier Refining Company should be on the other end of this lawsuit.

The facts are that when in 1949, Blue Bell companies agreed to distribute Frontier products in Idaho and Utah, Blue Bell of Idaho discontinued the use of its labels and advertising materials and commenced using the Frontier labels, brands and advertising; and it did so not only with Frontier's acquiescence, but with its active cooperation. As a matter of fact, it is plain that both parties realized the mutual advantage of the use of the Frontier mark in Idaho. Indeed, Blue Bell registered the mark in Idaho in July, 1949, as its own, stating that it had used it in Idaho since April of that year. At about the same time, Blue Bell of Utah registered the name "Frontier Oil Company" and the expression "Rarin' to Go" in Salt Lake County, Utah, and it continued to exploit these symbols. And, it also adopted a simulation of the Frontier Refining Company's mark by substituting two fighting buffaloes in the place of the rearing horse and rider, with the numeral "90" immediately above, and "Frontier Oil Company" below.

"The adoption of a trade-mark does not * * * project the right of protection in advance of the extention of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade. * * *" United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 51, 63 L.Ed. 141; Katz Drug Co. v. Katz, 8 Cir., 188 F.2d 696. See also Nims, supra, § 218b, p. 644.

The trial court found that prior to the cut-off on February 27, 1950, any uses made of Frontier's trade-mark by Blue Bell in Idaho and Utah were authorized by Frontier, and with full knowledge of Frontier's prior adoption and use of the trade-mark and corporate name, "Frontier Refining Company"; that the authorized use of Frontier's trade-mark by Blue Bell companies in the states of Utah and Idaho in fact constituted use of the mark by Frontier in those states and created no rights in Blue Bell adverse to Frontier's rights therein. The court further found that as of February 27, 1950, Frontier withdrew from Blue Bell companies all authority and right to use its advertising material, its name, trade-marks or any simulation thereof in the states of Utah and Idaho; that Frontier did not acquiesce in the adverse use of the trade-mark or the trade-name "Frontier Oil Company"; and that the continued use of the Frontier trade-mark or simulations thereof for the sale of Blue Bell's products subsequent to February 27, 1950, were designed to and did confuse the public as to the origin of the products sold under such brands.

In sum, the court held that Blue Bell used Frontier's trade-mark with its authority and consent only so long as it sold its manufactured products. When it ceased to do so, the right to use the mark came to an end. We cannot say that these findings and conclusions are clearly erroneous and they are binding here. It follows that Blue Bell companies could acquire no adverse property rights in and to the trade-mark in

either state, and Frontier is not estopped to assert its exclusive right thereto. See Dad's Root Beer Co. v. Doc's Beverages, 2 Cir., 193 F.2d 77.

In 1949 and 1950, the Frontier trademark was undoubtedly established in the state of Idaho and that trade territory, and it was established by Blue Bell, acting as Frontier's distributor. It was Frontier's gasoline distributed by Blue Bell and the source or origin of the product was undoubtedly established in the public mind. When Blue Bell continued to advertise and sell gasoline under the Frontier label and mark after it ceased to distribute products of the Frontier Refining Company, the Frontier Refining Company ran an open letter in the newspaper to the citizens of Idaho Falls, Idaho, calling their attention to the fact that an Idaho oil company had been advertising and selling petroleum products under the name of Frontier; that the sale of these products under the name of Frontier was not authorized by the Frontier Refining Company, and it was then seeking an injunction to restrain the use of the name. The letter went on to say that Frontier "Rarin' To Go" products would soon be available in the community through Frontier dealers. Thereafter, Blue Bell ran an ad in another paper in Idaho displaying the trade-mark of the rearing horse and rider and the expression "Rarin' To Go", and advertising "Frontier's own specially refined FRONTIER GAS available in Idaho only through authorized Frontier Company stations." There can be little doubt that the continued advertisement and sale of "Frontier Gas" by Blue Bell as its own product was both confusing and deceptive.

 We agree with the trial court that the use of Frontier's trademark and trade-name by Blue Bell of Idaho in Idaho subsequent to February 27, 1950, constituted infringement and unfair competition. We also agree that the use of the mark substituting fighting buffaloes for the rearing horse and rider by Blue Bell of Utah in Utah was confus-

ingly similar to Frontier's mark and constituted an infringement in that state. Avrick v. Rockmont Envelope Co., 10 Cir., 155 F.2d 568; Nims, supra, § 221c, p. 671; Restatement of Torts, §§ 728–729.

Having found infringement and decreed injunctive relief, the trial court submitted the measure of profits and damages to the advisory jury on the theory that Frontier was entitled to recover from the Blue Bell companies the profits attributable to the use of the Frontier trade-mark in Idaho and Utah during the period of infringement. Proof was introduced tending to show that during the period in question, Blue Bell of Idaho realized a total profit of $37,094.40 from its operations in Idaho; and that Blue Bell of Utah realized a total profit of $14,611.44 from its operations in Utah. The jury was instructed that if it found from a preponderance of the evidence that Blue Bell had realized business profits which were not due to the use of Frontier's trade-mark, Frontier would not be entitled to recover damages for any such sales or profits. The jury returned a verdict against Blue Bell of Idaho in the sum of $22,256.00, and against Blue Bell of Utah in the sum of $8,766.-00. The trial court approved the verdicts and entered judgment accordingly.

Complaining of the instructions of the court, Blue Bell argues that the court confused profits to Blue Bell with damages to Frontier. The contention is to the effect that Frontier's measure of recovery for the infringement, if any, is the actual loss suffered by Frontier, and that Frontier proved no loss which could form the basis of a judgment equal to 60 per cent of Blue Bell's profits. They say that since Frontier did not compete in the market in Idaho and Utah, it could have suffered no recoverable damages, and the verdict is therefore unsupported by any evidence.

 Out of the welter of confusion occasioned by the judicial effort to fashion a remedy which would satisfy

both legal and equitable concepts of appropriate relief for patent and trademark infringements, the courts have now settled on the theory that a trade-mark infringer is liable as a trustee for profits accruing from his illegal acts, even though the owner of the mark was not doing business in the consuming market where the infringement occurred. See Dad's Root Beer Co. v. Doc's Beverages, supra, and cases cited; Sammons v. Colonial Press, 1 Cir., 126 F.2d 341; Sheldon v. Metro-Goldwyn Pictures Corp., 309 U.S. 390, 60 S.Ct. 681, 84 L.Ed. 825; Codman v. Crocker, 203 Mass. 146, 89 N.E. 177, 25 L.R.A.,N.S., 980; Nims, supra, §§ 419–420. Recovery is predicated upon the equitable principle of unjust enrichment, not the legal theory of provable damages. In the exercise of its discretion, the trial court may refuse to award profits of the infringer in unusual circumstances where the owner has abandoned the trade territory in which the profits were realized, and has shown no disposition to enter the field, as in Morand Bros. v. Chippewa Springs Corp., 7 Cir., 2 F.2d 237. But, no such unusual circumstances are presented here.

While the trial court did speak of the measure of recovery in terms of damages, the case was squarely and correctly presented to the jury on the question of recoverable profits. And, the court also very properly placed the burden upon Blue Bell companies of showing that the profits realized by them were not attributable to the infringement. See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co., 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381; Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386; Century Distilling Co. v. Continental Distilling Corp., 3 Cir., 205 F.2d 140. The verdict of the jury was well within the proof of realized profits and will not be disturbed.

Frontier has cross-appealed from the refusal of the court to award attorney fees and accounting costs as a part of the assessable costs. It concedes, however, that the matter rests largely within the discretion of the trial court. In view of all the circumstances, it cannot be said that the court abused its discretion in that respect, and the judgment in all respects is affirmed.