**AKTIEBOLAGET ELECTROLUX, a Swedish Corporation, Plaintiff,**

v.

**ARMATRON INTERNATIONAL, INC., a Massachusetts Corporation, Defendant.**

**Civ. A. No. 90–13068–WD.**

United States District Court, D. Massachusetts.

Sept. 14, 1992.

Judgment Oct. 27, 1992.

---

Paul J. Hayes, Dean G. Bostock, Weingarten, Schurgin, Gagnebin & Hayes, Boston, MA, for plaintiff.

Erik Lund, Sibley P. Reppert, Posternak, Blankstein & Lund, I. Stephen Samuels and Maurice E. Gauthier, Samuels, Gauthier & Stevens, Boston, MA, for defendant.

### MEMORANDUM AND ORDER

WOODLOCK, District Judge.

On April 10, 1992, I found the defendant, Armatron International, Inc., liable under the Lanham Act to plaintiff Aktiebolaget Electrolux, owner of the federally registered trademark WEED EATER. At that time, I enjoined Armatron from using the mark LEAF EATER in connection with the sale of leaf shredders without the accompanying words FLOWTRON or VORNADO in lettering of equal or greater size. The question of damages, which the parties had agreed to bifurcate from the trial on liability, is now before me in the form of the defendant's request that I pretermit further discovery

because no further relief is appropriate in this case. After careful examination of this Circuit's caselaw, I conclude that the injunction previously entered provides all the relief to which plaintiff is entitled and that further discovery should be stayed pending the submission of a summary judgment motion by defendant designed to dispose of this case.

## I

### The Nature of the Liability

The facts that demonstrate Armatron's liability are recorded in the transcript of the April 10, 1992 bench trial, and I will not rehearse them in detail here. I will, however, reiterate my essential holding and findings at that trial, because those findings clarify the precise legal theories that justified relief for the plaintiff and influence my judgment on the issue of damages.

In entering the injunction, I applied this Circuit's test, as announced in *Keds Corp. v. Renee International Trading Corp.*, 888 F.2d 215, 222 (1st Cir.1989), to assess likelihood of confusion. I made the following determinations:

(A) The defendant's LEAF EATER mark is similar to WEED EATER, but the similarity was diluted somewhat by the frequent use of Armatron's two logos, VORNADO and FLOWTRON. *See* April 10, 1992 Tr. (hereafter Tr.) at 36–37.

(B) The goods themselves—the plaintiff's weed trimmer and blower vacuum and the defendant's leaf shredder—are similar in only the broadest sense. As I explained, they are "in the same ball park, but they're not precisely the same . . . in point of fact, . . . person[s] coming in to purchase these two separate items would not be confused that dragging out a Leaf Eater, they would be providing themselves with a Weed Eater." *Id.* at 38.

(C) The parties' products are marketed through the same channels of trade, using the same advertising media, and to the same class of consumers. *Id.* at 38–39.

(D) The plaintiff had made only a "weak showing" of actual confusion through equivocal survey evidence indicating at best name association confusion. The plaintiff, moreover, was unable to produce any instances of actual customer confusion after six years of co-existence between the parties. *Id.* at 40–41.

(E) The defendant had not acted with bad faith in adopting its mark, but was also "not unaware" of the plaintiff's strong trademark and the risk of legal challenge. *Id.* at 42.

(F) The WEED EATER mark is a strong mark, but not one that "occupied the entire field." *Id.* at 43.

In weighing these various findings, I determined that the overall balance indicated a likelihood of confusion sufficient to justify the narrow injunction entered. I did not, however, tie that holding directly to the specific causes of action alleged in Electrolux's complaint, because they all hinged on the same question of likelihood of confusion. I now step back to crystallize the statutory bases for Electrolux's injunctive success, because, as developed below, the precise theory of recovery is arguably relevant to the availability of damages.

The plaintiff's complaint primarily states claims for trademark infringement and unfair competition under the Lanham Act.[1] The two claims, though often closely intertwined, are nonetheless distinct and of different scope. Title 15, Section 1114(1) of the United States Code, defining trademark infringement, proscribes the unauthorized use of a mark similar enough to a federally registered trademark to be "likely to cause confusion, or to cause mistake, or to deceive." Section § 1125 of Title 15, often referred to as proscribing "false designation of origin,"

---

1. The complaint also alleged common law trademark and unfair competition, violation of Mass. Gen.L. ch. 93A, and trademark dilution. During the several stages of briefing in this case, the plaintiff focused its energies on the federal causes of action and essentially waived the common law and state claims. Similarly, in its briefs relating to the instant issue of damages, the plaintiff argues solely in terms of recovery under the Lanham Act. *See* Plaintiff's Brief on the Issue of Damages at 2. Consequently, I treat this case as entirely comprehended within the Lanham Act.

as well as federal unfair competition, creates a statutory tort broader than common law unfair competition and the law of infringement. That section "is designed to reach, among other things, attempts to appropriate the goodwill associated with a competitor's trademark by means of confusingly similar packaging, which would create the impression that the products of the defendant originated with the plaintiff." *Purolator, Inc., v. EFRA Distributors, Inc.,* 687 F.2d 554, 560–61 (1st Cir.1982). Claims under either section may be established by proving a likelihood of confusion. *See id.* at 559–561; *Pignons S.A. de Mecanique v. Polaroid Corp.,* 657 F.2d 482, 293 (1st Cir.1981).

In finding that the balance of factors suggested a likelihood of confusion, I necessarily determined that the plaintiff had met its burden under both §§ 1114 and 1125. Certainly, Armatron's use of a mark close enough to Electrolux's federally registered WEED EATER to suggest likely confusion constitutes trademark infringement under § 1114. Similarly, the defendant's transgressing mark created an "impression that the products of the defendant originated with the plaintiff" sufficient to establish a § 1125 claim. Indeed, at the trial, I expressed the view that, "while the goods may not be confused, who it is who produces those goods could be," and that there was a serious possibility of resulting "confusion regarding the origin or source of the goods." *See* Tr. at 39. Consequently, in addressing the appropriateness of damages, I treat the plaintiff as having made out claims under the Lanham Act both for trademark infringement and unfair competition, each based on a showing of possible confusion as to origin.

## II

### *Monetary Recovery*

As one commentator has observed, "[t]he case law on monetary recovery in trademark infringement cases is a confusing melange of common law and equity principles ... finding little statutory guidance in the Lanham Act." J. Thomas McCarthy, Trademarks and Unfair Competition § 32:24, at 495 (2d ed. 1982) (hereafter McCarthy). Add to the scant direction provided by the statute a

diversity of views and emphases among the various circuits and the issue of damages is further clouded, "making predictability of result a dangerous undertaking." *Id.* The First Circuit has not always taken an absolutely consistent approach to the question of trademark damages, and historically has shifted in view somewhat. Nonetheless, certain requirements the Court of Appeals has repeatedly imposed guide my judgment in the instant case.

The statutory provision for damages, on which both parties rely, reads as follows:

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, or a violation under section 43(a) [15 U.S.C. § 1125(a)], shall have been established in any civil action arising under this Act, *the plaintiff shall be entitled,* subject to the provisions of section 29 and 32 [15 U.S.C. §§ 1111, 1114], and *subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action.* The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. *Such sum in either of the above circumstances shall constitute compensation and not a penalty.* The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a) (emphasis added). While this section appears to make the accounting and recovery of monetary damages automatic upon a finding of infringement or federal unfair competition, the courts have

clearly held otherwise by drawing on the phrase, "subject to the principles of equity." *See* McCarthy at 514. Interpreting a predecessor to the current version of the damages provision, the Supreme Court has written that, in both trademark and unfair competition cases, "an accounting has been denied where an injunction will satisfy the equities of the case." *Champion Spark Plug Co v. Sanders,* 331 U.S. 125, 131, 67 S.Ct. 1136, 1139, 91 L.Ed. 1386 (1947) (citations omitted). Where there was "no showing of fraud or palming off" and the likelihood of damages to the plaintiff "seem[ed] slight," monetary relief was held not warranted. *Id.* The First Circuit has followed the Supreme Court's lead in recognizing the "clear distinction between the showing required to establish a right to injunctive relief and that required to establish a right to damages." *See Camel Hair and Cashmere Institute, Inc. v. Associated Dry Goods.,* 799 F.2d 6, 12 (1st Cir.1986). Having proven a wrong justifying injunctive relief, the Lanham Act plaintiff must nonetheless show something more for damages. I turn to what that "more" is.

Three themes frequently reappear in the First Circuit's discussions of damages under the Lanham Act. First, the plaintiff is often required to show actual damages, i.e. that it suffered actual and provable harm to its business. *See, e.g., id.* Second, plaintiffs seeking damages in the form of the defendant's profits, such as the plaintiff in this case, are typically required to prove that they are direct competitors of a defendant who effectively appropriated what would have been their business. *See, e.g., Raxton Corp. v. Anania Associates, Inc.,* 668 F.2d 622, 635 (1st Cir.1982). Finally, the defendant's bad conduct, for example, in palming off inferior goods in a deceptive manner, is often taken into account as an equitable consideration. *See, e.g., Valmor Products Co. v. Standard Products Corp.,* 464 F.2d 200, 204 (1st Cir.

1972). Because these "requirements" are often cabined by qualifying language, a detailed historical overview of the development of the caselaw in this Circuit is warranted.

In an early discussion of the issue, the First Circuit took an expansive view of the availability of damages under the Lanham Act. Where an upholsterer used the name "Simmonds" in a fashion likely to cause confusion with a furniture manufacturer's mark "Simmons," the First Circuit upheld an award of damages to the manufacturer on the following logic:

> While some of the goods sold by defendants did not compete with those sold by plaintiff, they were all sold under the name "Simmonds." "[A] trade-mark infringer is liable as a trustee for profits accruing from its illegal acts, even though the owner of the mark was not doing business in the consuming market where the infringement occurred."

*Baker v. Simmons Company,* 325 F.2d 580, 582 (1st Cir.1963) (citing *Blue Bell Co. v. Frontier Refining Co.,* 213 F.2d 354, 363 (10th Cir.1954), *cert. denied,* 382 U.S. 820, 86 S.Ct. 49, 15 L.Ed.2d 67 (1965). The thrust of the court's logic was that, even where the parties do not compete directly in the same consumer market, the defendant's profits belong to the plaintiff where those profits are in some way attributable to the infringing acts. While later opinions read *Baker* in a narrower fashion and emphasize other factors that may have motivated the court's judgment, the language quoted above represents the First Circuit's most generous description of the availability of monetary relief under the Lanham Act.[2]

Five years after *Baker* was decided, Judge Garrity questioned its reasoning in *Phoenix Manufacturing Co. v. Plymouth Mfg. Co.,* 286 F.Supp. 324, 330–31 (D.Mass.1968). Analyzing the *Baker* decision and various inter-

---

**2.** The court did not address the factor, later to become crucial in the caselaw, of actual harm to the plaintiff. The opinion does make reference to the fact that the infringement had caused "actual confusion" and that the defendant was guilty of "fraud and palming-off," *see Baker,* 325 F.2d at 582, 583, both of which would suggest actual harm to the plaintiff and would become important factors in later cases. As described

below, Judge Garrity later said of *Baker* that, where the plaintiff had tried to take advantage of the defendant's substantial advertising and marketed an "incomparably inferior" product, "it is clear that the registrant [in *Baker*] was substantially damaged by the infringement." *Phoenix Manufacturing Co. v. Plymouth Mfg. Co.,* 286 F.Supp. 324, 331 (D.Mass.1968).

pretations of it by other courts, Judge Garrity explained that the First Circuit had seemed to take a "property right" view of trademark and to have justified an accounting on "principles of unjust enrichment." *Id.* at 330. In other words, the court had awarded damages based not on direct competition or provable loss, but primarily on the infringer's unjust gains. Suggesting that this liberal approach to damages did not square with the Supreme Court's holding in *Champion Spark Plug,* Judge Garrity nonetheless distinguished the unusual case before him, in which the plaintiff was a small manufacturer who had not been "damaged in any fashion" and might have even enjoyed a "free ride" on the larger defendant's advertising. *Id.* at 331. He contrasted such circumstances to the "normal case" of a small infringer marketing inferior goods and trading on a larger registrant's goodwill, in which case harm to the plaintiff "must be all but conceded." *Id.* The crux of his holding was that the plaintiff should not collect a money judgment where "it is far from clear that plaintiff has suffered any monetary damage as a result of defendant's infringement." *Id.*

Judge Garrity reiterated and refined his views on damages five years later in a case involving competing manufacturers of electronic programming controls for large capacity industrial heaters and burners. *See Electronics Corporation of America v. Honeywell, Inc.,* 358 F.Supp. 1230 (D.Mass.), *aff'd per curiam,* 487 F.2d 513 (1st Cir.1973), *cert. denied,* 415 U.S. 960, 94 S.Ct. 1491, 39 L.Ed.2d 575 (1974). His opinion closely scrutinizes the precise language of § 1117:

> Although the section asserts that "The court shall assess such profits and damages or cause the same to be assessed under its direction," this sentence does not mean that the court may without the benefit of any evidence of harm come up with a figure that it thinks just. And the following language in the section, to the effect that, with respect to profits, the plaintiff must show defendant's sales and, with respect to damages, that the court must make a finding of what the actual damages were, leaves no doubt that *Congress deliberately chose to limit the discretion of federal courts in awarding money judg-*

*ments in Lanham Act cases. Unless there is at least some evidence of harm arising from defendant's violation, a court may not award a money judgment based on profits or damages.* Were the section to be read differently there would be a great danger that money judgments would be, in essence, punishments; but it is apparent from the section's conclusion that money judgments "shall constitute compensation and not a penalty."

*Id.* at 1234 (citation omitted). The opinion then adds that equitable considerations, such as the nature of the defendant's conduct, can influence a district judge's exercise of discretion, but only after the initial threshold of actual harm is crossed. *Id.* Thus, in Judge Garrity's view, Lanham Act damages are principally compensatory and accordingly must reflect actual and provable loss. Under his approach, there remains some room for equitable adjustments, but only as an adjunct to a necessary preliminary finding of specified and actual financial harm.

A year before Judge Garrity wrote *Honeywell,* the First Circuit seemed to be leaning in a similar direction by narrowing the circumstances that would permit monetary relief. In *Valmor Products Co. v. Standard Products Corp.,* 464 F.2d 200 (1st Cir.1972), the court upheld an injunction entered against a defendant who had infringed the plaintiff's "Valmor" mark for beauty aids. Noting that damage awards are "subject to the principles of equity" under § 1117 and that the lower court had found neither fraud nor palming off, the court then reversed the trial court's order of an accounting:

> Since Standard's [defendant's] products do not, concededly compete with Valmor's [plaintiff's], Standard can hardly be thought, in the absence of fraud or palming off, to be a trustee for profits which but for the infringement would have been Valmor's, nor, when given the opportunity at several points, was Valmor's president able to specify any damages which his company had suffered. Accordingly, we hold that cancellation and an injunction against further use adequately satisfy Valmor's equities. In so holding we do not suggest that even where there is no direct competition a

464

party may not recover general damages by showing dilution of his mark through injury to his goodwill by marketing noticeably inferior goods. There was no such evidence here.

*Id.* at 204. Several principles flow from the court's treatment here. First, notwithstanding earlier intimations to the contrary in *Baker*, an infringer typically becomes the plaintiff's trustee for profits only where the parties compete directly and where the defendant can be said to have reaped profits that, absent the infringement, would have been the plaintiff's. Second, this rule requiring direct competition for damages may give way if the defendant is guilty of fraud or palming-off or markets "noticeably inferior goods" that dilute the plaintiff's mark. Finally, the Court of Appeals stressed, as did Judge Garrity in *Honeywell*, the plaintiff's obligation to "specify" the precise damages it suffered. The First Circuit, in short, was moving explicitly to a more circumscribed view of money damages in Lanham Act cases.[3]

In its next pronouncement on the issue of damages, the First Circuit both simplified and complicated matters. In *Quabaug Rubber Co v. Fabiano Shoe Co., Inc.*, 567 F.2d 154, 160 (1st Cir.1977), the court held that the plaintiff, a licensee of a federal registrant of the mark in question, did not have standing to sue for trademark infringement under § 1114, but did have standing under § 1125(a) to sue on a false designation of origin claim. After upholding the district court's entry of an injunction under § 1125 against the defendant shoe manufacturer's use of certain yellow labels on soles, the court reversed the award of money damages under the same section. Citing Judge Garrity's opinion in *Honeywell*, the court explained, "In order to recover damages for a section 1125(a) violation, the aggrieved party

must show that it suffered actual harm to its business ... A precise showing is not required, and a diversion of sales, for example, would suffice ... However, section 1125(a) was not intended to provide a windfall." *Id.* at 161 (citations omitted). Thus, in at least one sense, *Quabaug* reiterates exactly what *Honeywell* and *Valmor* had stressed earlier: damage awards must reflect real and provable loss. Although recognizing that a "precise showing" of actual harm is often difficult to make, the court nonetheless affirms that some tangible evidence—a diversion of sales or proof of "injury to Quabaug's business reputation," *see id.* at 162—is a necessary prerequisite to legal, as opposed to injunctive, relief.

*Quabaug*, however, somewhat complicates matters by way of dicta in a footnote. In the midst of its discussion of actual harm under § 1125(a), the court adds as an aside:

In trademark infringement actions, however, recovery has been granted as a deterrent to deliberate infringement, e.g., *Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co.*, 349 F.2d 389 (2d Cir.1965), *cert. denied*, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206 (1966); also, under an unjust enrichment theory, e.g., *Blue Bell Co. v. Frontier Refining Co.*, 213 F.2d 354, 363 (10th Cir.1954). A showing of actual harm was not required.

*Id.* at 161 n. 15. The implication here is that the requirements for monetary relief are considerably more flexible in trademark infringement actions than in unfair competition suits under § 1125(a).

This footnote must be viewed in its particular context, however. In the first place, the court simply acknowledges the approaches adopted in other Circuits without expressly endorsing their deterrence or unjust enrichment theories. Second, the court gives no

---

3. While *Valmor* seems thus to undercut *Baker's* broad statement of the availability of damages, the First Circuit did not actually overturn its earlier decision and indeed cited *Baker* in the following way: "[The lower court] found neither fraud nor 'palming off.' *Compare Champion Spark Plug Co. v. Sanders*, 331, U.S. 125, 131, 67 S.Ct. 1136 [1140], 91 L.Ed. 1386 (1947) *with Baker v. Simmons Co.*, 325 F.2d 580 (1st Cir. 1963)." *Valmor*, 464 F.2d at 204. The court apparently looked back to *Baker* as a case in which the defendant's inequitable conduct of fraud and palming off inferior goods justified monetary relief despite the fact that many of the defendant's goods did not compete with the plaintiff's. Nonetheless, to the extent that *Baker* can be construed to mean that a non-competing infringer is *automatically* liable for his profits, its reasoning has evidently been cut back.

particular basis for applying a different rule to § 1125(a) cases than is applied to § 1114 cases. Finally, the two cases cited in the footnote seem largely to be driven by the defendants' inequitable conduct. In *Monsanto*, money damages were necessary to "deter those who deliberately engage in commercial piracy which defrauds thousands of consumers and injures a trade name built up at considerable cost by legitimate means." 349 F.2d 389. In the unique facts of *Blue Bell*—the principle case cited earlier by the First Circuit in *Baker*, 325 F.2d at 582—the defendant, who had once been authorized to use the plaintiff's mark, continued to do so after authorization was withdrawn and in a fashion which was "designed to and did confuse the public as to the origin of the products." 213 F.2d at 361. Thus, in both cited cases where the actual harm requirement was suspended, the defendant had affirmatively misbehaved and deceived consumers. To the extent *Quabaug*'s footnote appears to depart from the court's core holding, then, it should be read as an acknowledgement that the usual condition for monetary relief in a trademark infringement action—actual harm—is loosened in instances of willfully deceptive conduct. In this sense, the *Quabaug* footnote echoes recognition in both *Honeywell* and *Valmor* that equitable factors, such as the palming off of inferior goods, can influence the otherwise inflexible analysis based on actual harm and/or direct competition.[4]

In any event, whatever the inferences to be drawn from the *Quabaug* dicta, in subsequent discussions of Lanham Act damages, the First Circuit returned to the core rule of *Quabaug* and its predecessors. In *Raxton*, a woman's clothing store named "Off the Rax" and a men's clothing store named "Off the Rack" sued each other for, *inter alia*, violations of § 1125(a) and common law trademark infringement. 668 F.2d at 623. Citing *Quabaug*, the court held,

> The District Court quite properly denied Rack's request for an accounting for profits. The two companies do not compete directly for business (Rack sells men's clothing, Rax sells women's), and Rack offered no proof of actual damages. Under these circumstances, an accounting for profits is not authorized, either by the Lanham Act or by Massachusetts common law.

*Id.* at 625. In emphasizing once again the plaintiff's obligation to prove that it was a direct competitor of the defendant and suffered concrete harm, the opinion notably refers simply to the Lanham Act and does not distinguish, as *Quabaug* did, between actions under § 1114 and those under § 1125(a). To be sure, only a *state* trademark infringement claim was adjudicated in the case, but there appears no reason the rule for damages should be different under § 1114 and its common law counterpart. In the First Circuit's most recent discussion of the issue, the Court has reiterated without qualification or distinction that, under the Lanham Act generally, "a plaintiff must show actual harm to its business, a diversion of sales, for example, in order to recover damages." *Camel Hair*, 799 F.2d at 12.

 Having reviewed the relevant First Circuit cases, I discern a series of rules and factors that go into the damage analysis:

(A) Typically, a plaintiff seeking damages for trademark infringement or false designation of origin under the Lanham Act must prove actual harm, such as the diversion of sales to the wrongdoing defendant. This approach derives from § 1117's essentially compensatory nature.

(B) Bound up with the necessity of actual harm is the further requirement that, if it seeks an accounting for the defendant's profits, the plaintiff usually must show direct competition such that the defendant's profits would have been its own absent the infringement.

(C) This general rule of direct competition may be loosened where the defendant is found to have acted fraudulently or to have deceptively marketed an inferior good, in

---

4. It worth noting that at least one commentator has suggested the First Circuit is among those courts that "have indicated an unwillingness to allow an accounting for profits under the new unjust enrichment theory." *See* McCarthy, § 30:25 at 504 & n. 16. In making this characterization, the commentator cites *Quabaug*.

which case real harm is apparently presumed.

(D) There is also equivocal support in *Baker* and in footnote 15 of *Quabaug* for the alternative application of an unjust enrichment or deterrence theory that overrides the need to show actual harm. *Quabaug* suggests that such alternative bases for financial liability are restricted to trademark infringement actions and cannot enter into analysis under § 1125(a). To the extent they exist, these exceptions nonetheless only obtain where the defendant's inequitable conduct warrants bypassing the usual rule of actual harm.

While the First Circuit's approach to damages is thus a strict one, it is largely consistent with the general caselaw in this area as crystallized by the American Law Institute's developing draft Restatement (Third) of the Law of Unfair Competition §§ 36, 37 (Tent. Draft No. 3, 1991). These sections of Tentative Draft No. 3 were favorably considered by the Institute's membership at its 1991 Annual Meeting. They distinguish between awards of *damages,* which compensate the plaintiff for "proven pecuniary loss," and an *accounting of defendants' profits,* which "measures and transfers to the plaintiff the gains resulting from defendant's wrongful conduct." *Id.* § 36, comment C at 108 and § 37, comment A at 129. In elucidating this distinction, the draft does not change the traditional analysis of legal relief for trademark infringement actions, but merely clarifies parallel strains in the historical approach to monetary relief.

As to *damages,* the proposed section reads:

§ 36. Damages

(1) One who is liable to another for . . . infringement of the other's trademark . . . is liable for the pecuniary loss to the other caused by the . . . infringement, unless an award of damages for such pecuniary loss is prohibited by statute or is otherwise inappropriate.

(2) The pecuniary loss for which damages may be recovered under the rule stated in this section includes:

(a) loss resulting to the plaintiff from sales or other revenues lost because of the defendant's conduct;

(b) loss resulting from sales made by the plaintiff at prices that have been reasonably reduced because of the defendant's conduct;

(c) harm to the market reputation of the plaintiff's trademark, goods, services, or business; and

(d) reasonable expenditures made by the plaintiff in order to prevent, correct, or mitigate the confusion or deception of prospective purchasers resulting from the defendant's conduct.

(3) Whether an award of damages for pecuniary loss is appropriate under the rule stated in Subsection (1) depends on comparative appraisal of all the factors of the case, including the following primary factors:

(a) *the degree of certainty with which the plaintiff has established the fact and extent of pecuniary loss caused by the defendant's conduct;*

(b) the intent of the defendant and the extent to which it knew or should have known that its conduct was unlawful;

(c) *the role of the defendant in bringing about the infringement or deceptive marketing;*

(d) any unreasonable delay by the plaintiff in bringing suit or asserting its rights; and

(e) any related misconduct on the part of the plaintiff.

(Emphasis added).

■ Paralleling the First Circuit's approach, this section both implicitly and explicitly predicates trademark damages on the plaintiff's ability to show identifiable pecuniary loss, whether in the form of diverted sales, forced lowering of prices, or harm to business reputation. That such provable loss is a prerequisite to recovery under this section is emphasized by comment h at 113, where the authors of the draft explain that "in the absence of satisfactory proof of pecuniary loss, the plaintiff is not entitled to an award of damages." Section 36 of the draft

Restatement is also consistent with the First Circuit's approach in permitting equitable considerations, such as defendant's intent, to influence the determination of damages once satisfactory proof of some harm is made.

As to an accounting, the draft section reads:

§ 37 Accounting of Defendant's Profits

(1) One who is liable to another for . . . infringement of the other's trademark . . . is liable for the net profits earned on profitable transactions resulting from the unlawful conduct, if, but only if:

(a) *the actor engaged in the conduct with the intention of causing confusion and deception;* and

(b) the award of profits is not prohibited by statute and is otherwise appropriate.

(2) Whether an award of profits is appropriate under the rule stated in Subsection (a) depends upon a comparative appraisal of all the factors of the case, including the following primary factors:

(a) the degree of certainty that the defendant benefited from the unlawful conduct;

(b) the relative adequacy to the plaintiff of other remedies;

(c) the interests of the public in depriving the defendant of unjust gains and discouraging unlawful conduct;

(d) the role of the defendant in bringing about the infringement or deceptive marketing;

(e) any unreasonable delay by the plaintiff in bringing suit or asserting its rights; and

(f) any related misconduct on the part of the plaintiff.

(Emphasis added).

■ As noted above, the purpose of this measure of recovery is not so much to compensate the plaintiff for proven pecuniary loss, but to transfer to the plaintiff profits the defendant has reaped as a result of his wrongful conduct. Accordingly, the linchpin of an accounting is not the plaintiff's loss, but the defendant's *wrongful* gains. "[B]ad faith is a prerequisite to the recovery of the defen-dant's profits." *See id.* comments e and f at 132–33. This section draws on theories of unjust enrichment and principles of deterrence, *see id.* comment b at 131, to vindicate the plaintiff who has been wronged by deliberately deceptive conduct on the part of the defendant.

■ While these draft sections divide the damages analysis into two distinct inquiries which courts often conflate, they are substantively congruent with the First Circuit's various statements concerning monetary relief under the Lanham Act. Both the draft Restatement and this Circuit's caselaw basically require the plaintiff to prove actual harm in some form to recover damages. Where that harm is not satisfactorily proven, the plaintiff may still be entitled to an accounting, but only where the defendant has acted in a wilfully deceptive manner and is guilty of "bad faith." Finally, both the Restatement and the First Circuit's approach recognize that, in the absence of proven harm or misconduct on the part of the defendant, injunctive relief will usually satisfy the equities of the case. As the commentary to § 36 of the proposed draft explains with reference to both damages and an accounting,

Liability for trademark infringement and deceptive marketing requires proof only of a likelihood of harm, and an injunction against the unlawful conduct is normally an adequate and appropriate remedy absent proof of actual harm. An injunction may be insufficient, however, when the plaintiff has suffered a pecuniary loss or the defendant has been unjustly enriched by the wrongful. conduct.

*Id.* § 36, comment c at 108.

■ Applying the various factors articulated by the First Circuit, and seasoning my judgment with the distillation of the caselaw embodied in the draft Restatement sections, I find that Electrolux is not entitled to damages in addition to the injunction it has already obtained. I address the crucial factors in turn.

First, the plaintiff has proven unwilling and incapable of showing the actual harm that must precede an award of damages. In its initial brief on the issue of damages, the

plaintiff merely made the conclusory argument that it competes with the defendant, who has profited by its use of a mark similar to WEED EATER. *See* Plaintiff's Brief on the Issue of Damages at 4–5 (hereafter Plaintiff's Brief). After the defendant argued correctly that the plaintiff is required to show actual harm, *see* Defendant's Memorandum on Defendant's Profits as an Improper Measure of Damages at 2–5 (hereafter Defendant's Memorandum), the plaintiff responded only by citing *Baker*'s questionable proposition that the general infringer is a "trustee" for profits and by insisting that I draw the inference that Armatron has "derived very substantial revenues" from its infringement. *See* Plaintiff's Response to Defendant's Briefs on the Issue of Damages at 2–3.

For reasons already noted, reliance on *Baker* is questionable in light of subsequent discussions of this Circuit that restrict the availability of damages. *Baker*'s implicit endorsement of an unjust enrichment theory of recovery has been sequentially eroded through the years, and, as discussed below, its reasoning was based largely on equitable factors not present here. Moreover, the plaintiff's conclusion that Armatron derived substantial revenues from its use of LEAF EATER is premised entirely on an Armatron officer's monosyllabic response of "yes" at his deposition to the leading question, "So the term Leaf Eater has, as you said, a monumental and significant effect on your ability to sell your product; is that right?" *See* Plaintiff's Brief at 5. Whatever inferences I might draw from the words foisted on the deponent, a concession that one's own mark helped sell a product does not necessarily prove that the profits resulted precisely from the *infringing aspects* of the mark. The officer did not concede, for instance, that LEAF EATER was effective *because* it resembles WEED EATER. More important, the appropriate focus for damages is, in any event, not on what the defendant earned, but on what the plaintiff lost. Thus, even if I assume it has been shown that the name LEAF EATER boosted Armatron's sales, that showing would not concomitantly prove that Electrolux was thereby damaged. Electrolux would have to prove that the defendant's gains were at Electrolux's expense

through evidence of, for example, diverted sales or serious customer confusion.

The closest Electrolux comes even to trying to prove the requisite actual harm is through its proffer of nebulous survey evidence. As I noted at the hearing, *see* Tr. at 39–42, the survey is divorced from the real-life world of the retail market in which the parties operate and at most makes out a case of name association confusion. And while I found that the survey might modestly enhance the case for *likelihood* of confusion, it does little to suggest that customers were *in fact* confused when purchasing the relevant goods. Thus, the plaintiff has shown none of the type of diverted sales opportunities or customer confusion that can make out actual harm. Nor has Electrolux shown that the defendant has deceptively marketed such an inferior product that actual harm may be presumed to have resulted. *See Phoenix Manufacturing*, 286 F.Supp. at 331. Indeed, in an effort to explain that actual confusion would be difficult to prove through customer comments, the plaintiff specifically argued that both parties' products were of high quality and unlikely to be subject to customer returns. *See* Tr. at 41. In short, there is no prospect of colorable evidence of actual harm to the plaintiff, and thus there is generally no basis for awarding monetary relief.

The second factor militating against an award of damages is the lack of direct competition between the goods of the plaintiff and those of the defendant. I recognize that the parties compete in a general sense in the home gardening market, but the cases require a more precise and direct competition between similar products. Thus, the First Circuit found that a company selling women's clothing does not "compete directly for business" with a company selling men's clothing. *See Raxton*, 668 F.2d at 625. Similarly, the court treated as conceded that the manufacturer of goods including hair pomade, dressing, and tonic did not compete directly with a manufacturer of electric hair brushes and hair curling sets. *See Valmor*, 464 F.2d at 202, 204. Products designed with similar general purposes in mind, in other words, are not necessarily direct competitors for purposes of awarding damages. I find here an absence of direct competition between the plaintiff's blower/vacuum and the defendant's

leaf shredder.[5] I indicated as much at the hearing when I suggested that, while a consumer might be confused as to the origin of the defendant's product, a purchaser of a LEAF EATER would not understand that he had just bought one of the plaintiff's existing products. *See* Tr. at 38.

I acknowledge that plaintiff makes a somewhat compelling argument that the products of both parties mulch leaves and are advertised as such through the same channels of trade. *See* Plaintiff's Brief at 4. However, having closely scrutinized the plaintiff's trial exhibits and particularly those advertisements and articles describing the parties' products, I return to the obvious physical and functional differences between the goods. The Leaf Eater is a large, red, free-standing device into which leaves are poured solely for purposes of reducing the size of the unwanted piles of material. The Weed Eater blower/vacuum, on the other hand, is a hand-held unit that can blow leaves and other garden refuse into piles and vacuum up those piles in a fashion that mulches the material. *See,* e.g., Plaintiff's Exs. 29, 34. In other words, while one product is designed primarily to shred and compact previously collected matter, the other principally facilitates the collection itself. The only overlap is in the mulching function.

Given these sharp discrepancies in function, method of operation, and appearance, I do not perceive the type of competition with which the First Circuit has been concerned. As the cases hold, in order to justify an accounting, the plaintiff's product must typically compete with the defendant's in such a way that the defendant's profits would have been the plaintiff's absent the infringement. That formulation suggests that the infringing goods should appear to have been purchased *in lieu* of the plaintiff's product by the confused consumer. I did not find such confusion to have been shown here on the liability issue and there is no reasonable prospect of such a showing on damages. Armatron's packaging may have had the potential to create confusion as to the affiliation of its goods with Electrolux's WEED EATER

product line, but the defendant did not market a device which purported to be the blower/vacuum itself. Confusion as to origin does not necessarily mean confusion with regard to the precise goods. Thus, the lack of direct competition between the goods further undermines Electrolux's prayer for damages.

A third factor counseling against a money judgment is the absence of serious misconduct or fraud by the defendant. To the extent that I might relax the requirements of actual harm or direct competition, I would do so only if there were evidence of deliberate deception, fraud, or the like. I did find that Armatron was not utterly blameless in adopting LEAF EATER in full awareness of the plaintiff's similar mark and of the potential for legal challenge. However, I also found that the defendant's choice was a natural extension of its earlier and independent SKEETER–EETER labeling for insect killers and that, in adopting its new mark, Armatron was acting on the advice of an attorney who had approved the move to LEAF EATER. I declined to call Armatron's level of intent "bad faith" and likened it to a certain negligence in failing to recognize the potential for confusion. *See* Tr. at 42–43.

This level of fault—passive miscalculation—is not the type of abuse that warrants awarding money damages under principles of deterrence or unjust enrichment. The Supreme Court considered it significant in *Champion Spark Plug* that there had been neither fraud nor palming off. *See* 331 U.S. at 130, 131, 67 S.Ct. at 1139, 1139. The First Circuit in *Valmor* similarly noted twice that there was not a showing of fraud or palming off sufficient to award monetary relief. *See* 464 F.2d at 204. Indeed, in the one case in this Circuit in which damages were arguably awarded under an unjust enrichment theory, the court explicitly found fraud and palming off. *See Baker,* 325 F.2d at 583. Moreover, as noted above, while *Quabaug* acknowledged the possibility of awarding damages in trademark infringement cases, it did so by citing cases which involved deliberate deception on the part of the infringer. In this case, Armatron's carelessness in no way ap-

---

5. Electrolux does not argue that its weed trimmer competes with the defendant's product, but

only that its blower/vacuum does.

proaches active fraud or the willful deception involved in palming off one's own goods as another's. Consequently, I adhere to the usual rule that, in the absence of this type of inequitable conduct, the plaintiff must show actual harm to its business and must have directly competed with the defendant before an accounting will be ordered. This, plaintiff cannot do here.

The final factor influencing my determination is the lack of a sound numerical basis for awarding money damages. Where, for instance, the plaintiff is able to show diverted sales, a calculation of damages based on profits from those sales is logical and closely tied to what in fact the plaintiff lost. Where, however, the plaintiff has only shown a likelihood of confusion with respect to the defendant's products' source but has failed to prove tangible harm, an award of profits becomes conjectural and potentially punitive. I agree with Judge Garrity that § 1117—at least in the absence of gross misconduct—is designed primarily to compensate the plaintiff for what it has lost because of the infringement. If I were to make an award based on Armatron's unjust enrichment, as the plaintiff implicitly urges by relying on *Baker,* that award would necessarily be speculative and in violation of this principle of compensation. Rather than conjure up a figure from the defendant's profits or any other arbitrary numerical standard, and rather than reflexively and "without the benefit of any evidence of harm come up with a figure [I] think[ ] just," *see Honeywell,* 358 F.Supp. at 1234, I hold that the injunction already entered satisfies the equities of the case and that no money damages are owing.

## CONCLUSION

As is apparent from the foregoing discussion, I am presently of the view that the plaintiff has received all the relief to which it is entitled. Consequently, the case would appear ripe for a summary judgment motion as a means of providing a predicate for final judgment.

Accordingly, it is hereby ORDERED (A) that further discovery herein be stayed; (B) that the defendant shall file a motion for summary judgment on or before September 18, 1992; such motion need be accompanied by a memorandum of authorities only if there are additional authorities beyond those discussed in this memorandum defendant wishes to call to the Court's attention; and (C) the plaintiff shall respond to such motion on or before September 25, 1992.

## JUDGMENT

### October 27, 1992

In accordance with the statement of reasons delivered from the bench on April 10, 1992, the Revised Order dated June 4, 1992, and the Memorandum and Order dated September 14, 1992; and upon consideration of the defendant's motion for summary judgment filed September 18, 1992, and the related submissions of the parties, it is hereby ORDERED, ADJUDGED AND DECREED:

1. That the defendant Armatron International, Inc., ("Armatron") its officers, agents, employees, and those persons in active concert or participation with them (including defendant's distributors and other customers) who receive notice of this Order, are permanently enjoined from all use of the words LEAF EATER in connection with the making, selling or advertising of gardening equipment, except in combination with the words FLOWTRON or VORNADO in lettering of equal or greater size. Examples of such permissible use are shown on the attached Exhibit A.

2. That Armatron shall include a copy of this Judgment with every price proposal issued to any of its distributors or customers in connection with the sale or proposal for sale of any LEAF EATER product.

3. That if any customer of Armatron International, Inc. or any retailer is observed by Armatron, or is observed by any one who informs Armatron, to be using the words LEAF EATER, not preceded by the word FLOWTRON or the word VORNADO in letters of at least equal size, in its advertising or marketing, Armatron shall promptly notify such customer or retailer by letter that such advertising and/or marketing is in violation of a court order, and that in the future such occurrences will not be subject to advertising reimbursement, and that such custom-

er or retailer is required immediately to cease using any advertising or marketing material making use in any way the words LEAF EATER, except in combination with the word FLOWTRON, or the word VORNADO in lettering of equal or greater size. A copy of each such letter shall be sent by Armatron by Aktiebolaget Electrolux or its designee.

4. Plaintiff's Complaint is otherwise dismissed.

EXHIBIT A